.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

COTCHETT, PITRE & McCARTHY
and SPILLER • McPROUD,

       Appellants,               No. CIV S-10-0779 KJM

    vs.

CHARLES W. SILLER,

       Appellee,

_____/

COTCHETT, PITRE & McCARTHY
and SPILLER • McPROUD,

       Appellants,               No. CIV S-10-0780 KJM

    vs.

CWS ENTERPRISES, INC., a California
Corporation,

       Appellee,

_____/

       On April 6, 2011, the court heard argument on appellant Spiller • McProud's[1]

appeal from the decision of the Bankruptcy Court denying its motion for summary judgment.

Walter Dahl, Dahl & Dahl, and Steven Spiller appeared for appellant; Brad Benbrook, Stevens,

_____

[1] Appellant Cotchett, Pitre & McCarthy dismissed its appeal before the hearing.

1  O'Connell & Jacobs LLP,[2] appeared for the Chapter 11 Trustee, David Flemmer; and Andrea

2  Porter appeared telephonically for appellees Charles Siller and CWS Enterprises, Inc.

3          The court's jurisdiction to hear this interlocutory appeal is addressed in a separate

4  order, filed concurrently with this one.  28 U.S.C. § 158(a); Fed. R. Bankr. P. 8001(b).

5          The issue presented by the appeal is whether and to what extent a state court

6  judgment affirming an arbitrator's award of attorneys' fees is entitled to preclusive effect in

7  bankruptcy proceedings in light of 11 U.S.C. § 502(b)(4), which provides that a bankruptcy court

8  may allow a claim for attorneys' fees except to the extent that it exceeds the reasonable value of

9  those services.  The bankruptcy court concluded that the fact of the judgment was entitled to full

10  faith and credit but that the amount of that judgment was subject to the bankruptcy court's

11  determination of the reasonableness of those fees.  This court reverses and remands this case for

12  further proceedings, as explained below.

13  I.  Background

14          A.      Initial State Litigation By Appellee

15          In 1994, appellee Siller engaged the Friedburg Law Corporation to pursue

16  litigation against Siller Brothers, Inc., a company owned by Siller and his brothers.  Eventually

17  Siller substituted attorneys Randy E. Thomas and Dennis Hauser.  In 2000, Hauser and Thomas

18  filed an unsuccessful shareholder derivative suit on Siller's behalf.  In 2001, Hauser and Thomas

19  filed an action to dissolve Siller Brothers.  Excerpt of Record (ER) 202-203.  In addition, in

20  2001, Siller filed a malpractice action against the Friedburg Law Corporation.

21          In December 2001, Siller entered into a contingent fee contract with Cotchett,

22  Pitre & McCarthy (CPM) to pursue litigation concerning the corporate dissolution action against

23  his brothers and against the Friedburg Law Corporation and "to resolve any monies due Thomas

24

25

---

26          [2] Mr. Benbrook's firm affiliation has changed since the hearing date.

or Hauser." ER[3] 202-215.  At that time, there were outstanding judgments of approximately $10 million against Siller.  ER 205.  The contract between Siller and CPM contained an arbitration clause, nominating as arbiter the Judicial Arbitration Mediation Services (JAMS).  ER 213-214.

In May 2004, Siller entered into a contingent fee contract with Spiller • McProud (Spiller) "to act as [Siller's] general counsel to communicate to the Cotchett firm your ideas, suggestions, and requests concerning trial strategy, trial preparation and conduct of the trial [against Siller Brothers, Inc.] itself."  ER 217.  Spiller agreed to represent Siller "for a contingency fee of eight percent (8%) of the 'Net Amounts' recovered by settlement, compromise or trial under the same definition you have agreed with the Cotchett firm. . . ."  The parties also agreed "to incorporate the terms of the Cotchett fee agreement into this agreement except that the legal services that I have agreed to provide are as described in this letter agreement."  ER 218.

In July 2004, CPM and Spiller filed an ultimately unsuccessful action in Sutter County Superior Court seeking to enforce a buy/sell agreement so that Siller could purchase his deceased brother's shares in Siller Brothers.  ER 238.

In addition, CPM and Spiller negotiated a settlement of Siller's fee dispute with attorneys Hauser and Thomas and undertook a defense of appellee when he failed to pay the negotiated settlement.  ER 239.  They were terminated before the motion for summary judgment was filed in the Hauser/Thomas case.  ER 239.

Finally, CPM and Spiller represented Siller during pretrial proceedings and a two week trial on the dissolution action.  When Siller Brothers filed a notice of appeal, CPM and Spiller filed a cross-appeal and finally settled the case during mediation in the Court of Appeal. The settlement provided for $10 million in cash plus $20.5 million in real estate in exchange for /////

---

[3] ER refers to the Excerpt of Record.

1    Siller's shares in the corporation.  ER 188, 237.  Siller created the entity CWS Enterprises, Inc.

2    (CWS) based on the tax-related provisions of the settlement.  ER 238.

3           B.      Arbitration

4                  After Siller refused to pay the attorneys' fees, CPM and Spiller initiated

5    arbitration with JAMS.  Declaration of Ara Jabagchorian, ER 264 ¶ 2.  During an initial

6    telephonic conference call with the JAMS arbitrator, Siller and CWS, through counsel George

7    Wass, contended that the matter was not properly before JAMS.  ER 265 ¶ 3.  In May, Siller

8    filed a motion in Sutter County Superior Court to enjoin the arbitration.  ER 186-193 (opposition

9    to motion).  The Sutter County Superior Court denied the motion.  ER 265 ¶ 4.

10                 The arbitration hearing began on May 29, 2008.  Attorney George Wass again

11   appeared on behalf of Siller and CWS.  Wass submitted several motions *in limine* and cross-

12   examined Frank Pitre of CPM.  ER 265 ¶¶ 5-6.

13                 The arbitrator held a second session on July 7, 2008.  ER 265 ¶ 7.  Siller and

14   CWS were again represented by George Wass, with the assistance at that point of Lawrence

15   Ecoff.  The arbitrator took additional testimony from Frank Pitre, Steven Spiller and Charles

16   Siller and heard further arguments on the motions in limine.  ER 265 ¶¶ 7-8.  After the close of

17   the evidence, the parties submitted closing briefs.  ER 265 ¶ 9.

18                 On January 15, 2009, the arbitrator issued a lengthy written ruling.  Before

19   turning to the merits of the action, the arbitrator addressed the objections of Siller and CWS to

20   the arbitration, the joining of CWS as a party to the arbitration and the arbitrability of the claims.

21   ER 222-233.

22                 As a backdrop to his ultimate conclusion, the arbitrator reviewed the course of the

23   litigation undertaken by the CPM and Spiller firms on Siller's behalf.  After reviewing this

24   litigation history, the arbitrator noted that "[t]he matter having settled as contemplated in

25   Agreement ¶ IV, D, the Arbitrator must resolve a dispute which exists over the fair market value

26   or present value of the assets upon which the attorneys' percentage fees shall be computed."

ER 240.  He outlined the parties' contentions and noted that Siller's estimate that the settlement

was worth only $10 million was not supported by any appraisals or other evidence apart from

Siller's testimony.  The arbitrator then observed:

> Mr. Wass devoted most of his cross-examination to a detailed
> attack on how Mr. Pitre and Mr. Spiller spent their time on the
> case, on the theory that the Arbitrator might find the contract to be
> unconscionable (it is not) and that quantum meruit would be
> relevant.  Over objection, he was permitted to do so.  But this has
> and always has been a breach of contract case; and no
> counterclaim for legal malpractice was ever made by respondent.

ER 241.  He continued:

> The Fee Agreement made the attorneys fee and costs contingent
> upon recovery by Respondent. . . .The contingency was placed in
> writing and explained when and how such disbursements would be
> made. . . . The contingency in this case occurred, both in the form
> of a $45.7 million judgment and the receipt of properties and cash
> by Respondent Charles Siller.
>
> The contingency fee agreement percentage for both Petitioners was
> reasonable based not only on the amount of work put into the case
> but also the economic risks associated with the case, such as up
> front costs by counsel (*Ketchum v. Moses*, (2001) 24 Cal.4th 1122,
> 1132).  This form of deferred payment came with much labor,
> expense and risk to Petitioners.  Petitioner Pitre's office expended
> over 4800 attorney hours and 2700 paralegal hours working on
> Respondent's matters.  Petitioners financed the litigation out of
> their own pockets in an amount exceeding $400,000.
>
> In addition, Petitioners took great economic risk in that they would
> not have obtained any recovery for themselves unless the recovery
> exceeded the judgment lien Siller Brothers, Inc., had against
> Charles Siller which accumulated to $13,770,000 at the time the
> judgment was obtained.
>
> The attorneys fees were to be paid upon the receipt of the monies,
> properties or other assets.  Despite all this, Respondents continue
> to refuse to pay Petitioners despite their clear obligation to do so.

ER 242.  The arbitrator calculated the fee due to Spiller as $2,284,519.16 with prejudgment

interest of $212,118.01, for a total of $2,497,325.07.  He added:

> Respondents attack Spiller's contingency fee of 8% as
> "unconscionable."  Respondents fail to cite to any case that
> directly or indirectly holds such a position.  The law is quite the

1   contrary.  (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132
    (holding a contingent fee contract may properly provide for a
2   greater compensation than would otherwise be reasonable); *Rader
    v. Thrasher* (1962) 57 Cal.2d 244, 253; *Estate v. Guerin* (1961)
3   194 Cal.App.2d 566, 575 (holding a 50% contingency fee
    unconscionable).)

4
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
5
    In support of their contention that the 8% fee is unconscionable,
6   Respondents rely upon *Fergus v. Songer* (2007) 150 Cal.App.4th
    552 as "the standard in computing attorneys fees." . . .
7   Respondents simply misapply *Fergus*.  The factors used to
    determine reasonable attorneys fees in *Fergus* are only applicable
8   when there is no enforceable fee agreement.  In *Fergus*, the court
    held that the jury was required to consider nine factors to consider
9   reasonable attorney's fees, since the contingency fee agreements at
    issue were unenforceable due to a violation of the Business and
10  Professions Code.  (*Fergus v. Songer*, supra, 150 Cal. App.4th at
    560.)  But there is an enforceable fee agreement here.
11  Respondents have failed to establish any violation of the Business
    and Professions Code associated with the relevant fee agreements
12  in this matter.  Attempts were made through arguments asserted
    through their motions in limine, which were preliminarily denied
13  and devoid of factual support during the trial.  Therefore, the nine
    factors outlined in *Fergus* are inapposite.
14
    Finally, Respondents contend that Spiller provided no value to
15  Respondent Siller in this case.  The evidence presented
    demonstrates just the opposite.  The testimony was clear that
16  Spiller after his retention was involved with every aspect of the
    litigation along with Pitre's office.  Respondents' bald assertion
17  that Spiller did not work to benefit Respondents has no evidentiary
    basis.  Based on the evidence and the legal authority, Spiller is
18  entitled to his 8% contigency.

19  ER 242-243.

20        Spiller filed a petition in San Francisco County Superior Court to confirm the

21  arbitration award; Siller did not appear.  ER 256.  On February 13, 2009, the Superior Court

22  confirmed the arbitration award and entered judgment in Spiller's favor in the amount of

23  $2,497,325.07 plus $800.00 in costs, plus 10% interest from November 25, 2008 until paid.

24  ER 263.

25  /////

26  /////

C.      Bankruptcy Proceedings

Appellees Charles Siller and CWS (debtors) filed Chapter 11 bankruptcy petitions in this district in April 2009. *In re CWS Enterprises, Inc.*, No. 09-26849-C-11 (*CWS Docket*), ECF No. 1; *In re Charles W. Siller*, No. 09-26167-C-11 (*Siller Docket*), ECF No. 1.[4]  On Schedule D in each action, appellees listed Spiller • McProud's judgment liens in the amounts of $2,582,621.00 and $11,965,608.95, respectively. *CWS Docket*, ECF No. 20; *Siller Docket*, ECF No. 26.  David Flemmer was appointed Trustee in the CWS case on June 23, 2009.  Siller is debtor-in-possession in his case.

On June 8, 2009, appellant Spiller and CPM filed a joint creditors' claim in the total amount of $12,126,302.80, with $11,690,704.32 listed as principal and $435,598.48 in interest as of April 10, 2009.  ER 363-377.  Objections to the claims were apparently filed in both cases. The Excerpt of Record does not include copies of the objections to the claims and the objection is not apparent on the *Siller Docket*.  Siller, as the equity holder in the CWS case, filed an objection to the proof of claim. *CWS Docket*, ECF Nos. 205-206.  This objection is three pages long, provides a rough calculation of the hourly fee based on the figures provided to the arbitrator, and adds that "additional information about this objection can be obtained by contacting the undersigned counsel." *Id*., ECF No. 205 at 3.  It is supported by several pages from the arbitrator's decision and was set for hearing on January 13, 2010. *Id*., ECF Nos. 206-208.  Appellant and CPM apparently filed a response to this objection, though the CWS docket entry for Siller's response notes that appellant's opposition is "not on file." *CWS Docket*, ECF No. 237 (docket text).  The hearing on the objection was continued from January 13, 2010 until February 3, 2010. *CWS Docket*, ECF No. 253.

On February 2, 2010, appellant filed a motion for summary judgment in the bankruptcy actions, seeking an order dismissing appellees' objection to their claim or, in the

---

[4]  The court takes judicial notice of the records of the bankruptcy court in these cases.

alternative, to allow the claim as a final, non-contestable judgment and set the hearing on the motion for March 10, 2010. *Siller Docket*, ECF Nos. 191-192; *CWS Docket*, ECF Nos. 294-296. The court continued the hearing on Siller's objection to March 10, 2010. *CWS Docket*, ECF No. 303.

On February 3, 2010, the CWS Trustee filed a motion to continue the hearing on the CPM/Spiller claim. *CWS Docket*, ECF Nos. 309-311.

On February 10, 2010, Siller filed an opposition to the Cotchett/Spiller motion for summary adjudication or to allow the claim and a counter-motion for partial summary judgment. *CWS Docket*, ECF No. 312; *Siller Docket*, ECF No. 199.

On February 21, 2010, the CWS trustee filed an opposition/objection to the Cotchett/Spiller motion. *CWS Docket*, ECF No. 334.

On March 22, 2010, the bankruptcy judge denied the Cotchett/Spiller claimaints' motions and granted Siller's cross-motion. *CWS Docket*, ECF No. 355; *Siller Docket*, ECF No. 212. The written order was issued on April 9, 2010. *Siller Docket*, ECF No. 226-227; *CWS Docket,* ECF Nos. 408-409.

II.  Standard Of Review

A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." FED. R. BANKR. P. 8013. The court reviews "'the bankruptcy court's findings of fact under the clearly erroneous standard[,] . . . its conclusions of law *de novo*'" (*Clinton v. Acequia, Inc.* (*In re Acequia, Inc.*), 787 F.2d 1352, 1357 (9th Cir. 1986) (quoting *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir. 1986)) and "[m]ixed questions of law and fact . . . *de novo*." *Beaupied v. Chang* (*In re Chang*), 163 F.3d 1138, 1140 (9th Cir. 1998). "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer*, 470 U.S. 564,

/////

573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *see also Savage v. Greene* (*In re Greene*), 583 F.3d 614, 618 (9th Cir. 2009).

III.   Analysis

    A.   Procedural Posture And Burdens Of Proof

        To resolve the issues on this appeal, this court must delineate the relationship between the doctrines of full faith and credit and issue preclusion on the one hand and the generally *sui generis* nature of bankruptcy procedures.

        Under the provisions of the Bankruptcy Code, a creditor "may file a proof of claim;" the statute does not provide different provisions for claims reduced to judgment. 11 U.S.C. §§ 101(4), 501(a).  An executed proof of claim is *prima facie* evidence of its validity and amount.  *Bitters v. Networks Electronics (In re Networks Electronic Corp.),* 195 B.R. 92, 96 (9th Cir. BAP 1996).  Under 11 U.S.C. § 502(a), "a claim . . ., proof of which is filed under section 501 . . ., is deemed allowed, unless a party in interest . . ., objects."

        If an objection is made,

> the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such a claim in such amount, except to the extent that–
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> (4) if such claim is for the services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services.

11 U.S.C. § 502(b).  The "relevant time for determining one's status as an insider . . . is the time the services were rendered and when the compensation contracts for such services were formed." *In re Allegheny Intl., Inc*., 158 B.R. 332, 339 (W.D. Penn. 1992).[5]  The purpose of the provision

---

[5]  Appellant argues he is no insider, as demonstrated by the debtor's refusal to honor his commitments and appellant's subsequent arbitration to enforce his contingent fee contract; he argues that the cases finding the § 502(b)(4) cap applicable are those where the fees at issue appear to be the product of collusion between the debtor and counsel.  *See In re Segovia*, 387 B.R. 773 (Bankr. N.D. Cal. 2008).  Although there is a certain logical appeal to the argument, appellant cites no controlling authority and the court has found no law supporting it.  *Cf.* ECF

is "'to prevent[] overreaching by the debtor's attorneys and [the] concealing of assets by debtors.'"  *Matter of 268 Ltd.*, 789 F.2d 674, 677 (9th Cir. 1986) (quoting 1978 U.S. Code Cong. & Ad. News at 5849).  Courts that have applied the reasonableness cap on claims for prepetition attorneys' fees have not, however, considered whether the "reasonable value" cap applies when the fees have been reduced to a judgment.  *See, e.g., Landsing Diversified Properties v. First Nat. Bank and Trust Co.* (*In Re Western Real Estate Fund, Inc.*), 922 F.2d 592, 597 (10th Cir. 1990); *In re 268 Limited*, 85 B.R. 101 (9th Cir. 1988); *see Welzel v. Advocate Realty Inv. LLC* (*In re Welzel*), 275 F.3d 1308 (11th Cir. 2001) (when considering oversecured creditor under § 506(b), attorneys' fees must be evaluated for reasonableness).

Before turning to the merits of the proceedings in this case, the bankruptcy court observed that "the path to the answer winds through questions of procedure. . .," leading through a "procedural swamp." *In re Siller*, 427 B.R. 872, 878 (Bankr. E.D. Cal. 2010).  It further observed that claim objection proceedings are contested matters under Federal Rule of Bankruptcy Procedure 9014, and that summary judgment may be appropriate in contested matters under Federal Rules of Bankruptcy Procedure 7056 and 9014.  The court then determined that "the objection to the claim is what initiates the Rule 9014 contest and must be served in the manner of a summons and complaint, but because "[u]nder Rule 9014(a), no response is required . . . unless the court orders an answer," it is unclear "what constitutes the answer."  It concluded that the

> appropriate solution when an objection to a claim is met with a summary judgment motion is to treat the motion as the equivalent of a motion under Rule 12(b)(6) that presents matters outside the pleadings. Fed. R. Civ.P. 12(d).  If, as here, it is denied, then the court may require an answer to the objection, which will be in the nature of a more definite statement to which the objector would then file a response that closes the pleadings.

*Id.* at 879; *see also In re Coates*, 292 B.R. 894, 902 n.10 (Bankr. C.D. Ill. 2003) (concluding that

No. 14 at 11.

objection to claim "commences the litigation.  It joins the issue and nothing more."); *but see* Patrick A. Jackson, *Conceptualizing Claim Objections, Part I: The FED. R. CIV. P. Analogy*, 25 AM. BANKR. INST. J. 42 (2006) (a properly supported proof of claim is like a summary judgment motion, satisfying claimant's initial burden of going forward; burden then shifts to objector to go forward).

It is unclear to this court why the bankruptcy court took a detour into any procedural morass.  The requirement that a motion in a contested matter be served like a summons and not answered unless directed by the court applies "in a contested matter not otherwise governed by these rules."  FED. R. BANKR. P. 9014(a).  The process for allowance and disallowance of claims is governed by Rule 3007 of the Federal Rules of Bankruptcy Procedure, which provides only that "[a]n objection to the allowance of a claim shall be in writing and filed. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession, and the trustee at least 30 days prior to the hearing."  The bankruptcy court's local rules expand on this procedure:

> (b) . . . Unless the basis for the objection appears on the face of the proof of the claim, the objection shall be accompanied by evidence establishing its factual allegations and demonstrating that the proof of claim should be disallowed.  A mere assertion that the proof of claim is not valid . . . is not sufficient to overcome the presumptive validity of the claim.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> (c)(1)(i) . . . Opposition, if any, to the sustaining of the objection shall be in writing . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> The opposition shall specify whether the responding party consents to the Court's resolution of disputed material factual issues . . . . If the responding party does not so consent, the opposition shall include a separate statement identifying each disputed material factual issue. . . .

BANKR. E.D. CAL. R. 3007-1.  The creditors in this case called their pleading a "Motion for Summary Judgment, or in the Alternative Summary Adjudication To Dismiss The Objections . . .

1  To The Claim; or Alternatively To Allow The Claim . . . As A Final Non-Contestable

2  Judgment." *See CWS Docket*, ECF No. 294. This pleading fits within the process provided for

3  by the bankruptcy court's local rules. *See Jacks v. Wells Fargo Bank, N.A.* (*In re Jacks*), 642

4  F.3d 1323, 1332-33 (11th Cir. 2011) (discussing summary judgment as part of the objection

5  process when claimant filed a motion in response to objection to the claim); *Owens v. Murray,*

6  *Inc.*, 365 B.R. 835, 840 (Bankr. M.D. Tenn 2007) (focus on Rule 56 during part of claims

7  process is "within the permissible bounds of the Bankruptcy Court's claims determination

8  discretion"); *but see Jasco Tools v. Dana Corp.* (*In re Dana Corp.*), 574 F.3d 129 (2d Cir. 2009)

9  (considering whether the bankruptcy court erred in treating a debtor's objection to the claim as a

10  motion for summary judgment because the objection was structured like a summary judgment

11  motion).

12        The Ninth Circuit has described the claim allowance process as follows:

13        Section 501 of Title 11 of the United States Code allows creditors
         a means to present their claims against a debtor to the bankruptcy
14        court by filing a proof of claim. See 11 U.S.C. § 501. Whether
         such a claim for which a proper proof has been filed is "allowable"
15        is a matter for determination pursuant to 11 U.S.C. § 502 and the
         procedural rules governing the bankruptcy courts. These rules and
16        our case law have put in place a general procedure to allocate the
         burdens of proof and persuasion in determining whether a claim is
17        allowable.

18         A proof of claim is deemed allowed unless a party in interest
         objects under 11 U.S.C. § 502(a) and constitutes "prima facie
19        evidence of the validity and amount of the claim" pursuant to
         Bankruptcy Rule 3001(f). See also Fed. R. Bankr.P. 3007. The
20        filing of an objection to a proof of claim "creates a dispute which
         is a contested matter" within the meaning of Bankruptcy Rule
21        9014 and must be resolved after notice and opportunity for hearing
         upon a motion for relief. See Adv. Comm. Notes to Fed. R.
22        Bankr.P. 9014.

23        Upon objection, the proof of claim provides "some evidence as to
         its validity and amount" and is "strong enough to carry over a mere
24        formal objection without more." *Wright v. Holm* (*In re Holm* ), 931
         F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, Collier on
25        Bankruptcy § 502.02, at 502-22 (15th ed.1991)); *see also Ashford*
         *v. Consolidated Pioneer Mort.* ( *In re Consol. Pioneer Mort.*), 178
26        B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL

393533 (9th Cir.1996). To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d at 623.

For example, in *Holm*, we allocated to the debtor-objector the "initial burden of proof to demonstrate facts tending to demonstrate [that the claim included unmatured interest excluded from allowable claims under 11 U.S.C. § 502(b)(2) ]." *In re Holm*, 931 F.2d at 623. We concluded that the objector "ha[d] not met this burden" because he had presented no evidence bearing on the issue of unmatured interest. *Id.*

"If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re Consol. Pioneer*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. *See In re Holm*, 931 F.2d at 623.

*Lundell v. Anchor Construction Specialists* (*In re Lundell*), 223 F.3d 1035, 1039 (9th Cir. 2000).

Because the bankruptcy court here appears to have created its own procedure rather than consider whether the cross-motions for summary judgment fit within the established claims allowance procedure, it did not consider whether the objector had borne its burden. Instead, the court placed the burden of demonstrating reasonableness on appellants without apparently acknowledging that the objectors had any burden with respect to either the application of preclusion or reasonableness.

After outlining the procedural process it deemed applied, the bankruptcy court determined that appellants bore the burden of establishing reasonableness under 11 U.S.C. § 502(b)(4), which it characterized as "a federal question that is independent of state law requiring attorney's fees to be reasonable." *Siller*, 427 B.R. at 880. The court came to this conclusion in part because of the Supreme Court's admonition that insider dealings are subject to rigorous scrutiny. *Id.* at 881 (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)).

As noted above, claimants have the ultimate burden of proof on the claim. Whether they must ultimately prove the claim by a preponderance of the evidence depends on

the contents of the objection.  *Lundell*, 223 F.3d at 239; *see also Emmerson v. Regis* (*In re Emmerson*), 2011 WL 3299852, *4 (9th Cir. BAP Mar. 25, 2011) (party asserting issue preclusion has burden of establishing threshold requirements).   Some courts have determined that when the objection is insufficient to shift the burden back to the claimant, the court need not engage in *Pepper's* "rigorous scrutiny" of reasonableness.  *See McGee v. O'Connor* (*In re O'Connor),* 153 F.3d 258, 260-61 (5th Cir. 1998) ("If the Trustee objects, it is his burden to present enough evidence to overcome the *prima facie* effect of the claim. [citation omitted].  If the Trustee succeeds, the creditor must prove the validity of the claim. [citation omitted].  In *All-American Auxiliary*, the court applied the heightened scrutiny [of an insider's claim] only because the Trustee satisfied his burden . . . Here, the Trustee did not satisfy his burden."); *In re Russell Cave Company, Inc*., 253 B.R. 815, 819 (E.D. Ky. 2000) (applying the *McGee* approach); *In re Delta Smelting & Refining*, 53 B.R. 877, 884 (D. Alaska 1985) (objection to insider's claim rejected because of failure of proof by objecting party); *see also In re Taylor*, 2007 WL 7140157 (Bankr. N.D. Ga. 2007) (evidentiary presumption of Rule 3001 limited to validity and amount; where the claim is for fees that must be reasonable "the claimant must provide evidence from which the Court can determine reasonableness, or the evidentiary presumption will not arise"); *In re Lani Bird*, 129 B.R. 203, 205 (Bankr. D. Haw. 1991) (objecting party must come forward with "sufficient evidence" to put insider's claim at issue).  A relative minority of other courts finds the burden never shifts.  *See In re Coates*, 292 B.R. at 905 (evidentiary presumption of Rule 3001 is limited to validity and amount; reasonableness of fees and costs is a separate issue entirely and the burden "rests squarely on the claimant"); *In re Ellipso, Inc*., 2011 WL 482725, at *4 (Bankr. D. Colo. Feb. 7 2011) (recognizing split in law whether 3001(f) presumption of validity applies to reasonableness determinations).  Because the bankruptcy court here ignored the impact of its own claims procedures and the related burdens of proof on the instant proceedings, it did not determine whether the claim itself, based on a judgment, was sufficient under § 502(b)(4) to allow the claim in the amount submitted, or

1   whether the objection was sufficient to put the claimant to further proof.  This may also have led

2   the court to resolve the issue without referring to the transcript of the arbitration proceedings.

3         Moreover, as discussed below, the court determined that the state court judgment

4   could never be conclusive on the question of reasonableness because, in its view, "§ 502(b)(4)

5   preempts state law to the extent that state law permits claims on account of prepetition services

6   rendered by an insider or attorney for a debtor to exceed the reasonable value of services."

7   *Siller*, 427 B.R. at 883.  This court, then, considers the impact of the state judgment.

8         B.  <u>The Impact Of The State Judgment</u>

9         In resolving the parties' cross-motions, the bankruptcy court determined that the

10  state arbitration award, reduced to judgment, fixed the amount of the debtor's liability and

11  rendered the fees that were the subject of the arbitration award incontestable on state law

12  grounds.  It then applied California's rules on issue preclusion in determining the preclusive

13  impact of the judgment, but determined that the award was not conclusive of the reasonable

14  value of the fees under 11 U.S.C. § 502(b)(4).[6]  The court concluded that appellant has a claim

15  for the amount of the judgment, which appellees cannot contest, but "the open question--which

16  was not and could not have been resolved in prebankruptcy proceedings--is how much of that

17  claim is allowable under the 'reasonable value' of services restriction on the allowance of

18  claims."  *Siller*, 427 B.R. at 885.  The court determined that the primary right in the arbitration

19  was the enforcement of the fee contract subject to state law, while the primary right in enforcing

20  the § 502(b)(4) fee cap is the federal interest of assuring equitable distribution of assets in a

21  collective proceeding.  *Id.*

22        Appellant argues, and the trustee does not strenuously contest, that the state

23  court's judgment is entitled to full faith and credit under 28 U.S.C. § 1738.  The parties part

24  ways over the question whether the judgment is conclusive of the amount of the claim.  The

25

26        [6]  All subsequent statutory references are to Title 11 unless otherwise indicated.

1   trustee argues, as the bankruptcy court concluded, that it cannot be, because the reasonableness

2   of the fees was not litigated in the arbitration and could not have been given the limitation on

3   attorneys' fees contained in § 502(b)(4).  The trustee also says that the judgment is afforded full

4   faith and credit because the bankruptcy court uses it to establish the baseline claims.  On the

5   other hand, appellant contends the arbitrator did address the reasonableness of the fees, but even

6   if he did not, California's primary rights doctrine bars relitigation of anything subsumed in the

7   primary right asserted.

8           As noted above, in this case the claim has been reduced to a judgment.  Appellant

9   argues that under the Full Faith and Credit statute, the fact that this claim is embodied in the

10   Superior Court's judgment removes it from the operation of § 502(b)(4).  A bankruptcy court

11   may go behind a judgment and ignore its preclusive effect, appellant continues, only if the court

12   rendering the judgment lacked subject matter or personal jurisdiction or if the judgment was the

13   product of fraud or collusion.  Brief for Appellant, ECF No. 14 at 9.

14           There is no dispute that the Full Faith and Credit statute, 28 U.S.C. § 1738,

15   applies in bankruptcy proceedings.  *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 824 (9th

16   Cir. B.A.P. 2006), *aff'd*, 506 F.3d 956 (9th Cir. 2007).  Under that statute, a federal court must

17   "give the same preclusive effect to state court judgments [that] would be given in the courts of

18   the State from which the judgments emerged." *Kremer v. Chemical Construction*, 456 U.S. 461,

19   466 (1982).  In *Matsushita Electric Industrial Co., Ltd. v. Epstein*, 516 U.S. 367 (1996), the

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

Court considered the question whether a state court judgment could be preclusive with respect to issues that are exclusively federal:

> [T]he inquiry into state law [will] not always yield a direct answer. Usually, "a state court will not have occasion to address the specific question whether a state judgment has issue or claim preclusive effect in a later action that can be brought only in federal court." . . . . Where a judicially approved settlement is under consideration, a federal court may consequently find guidance from general state law on the preclusive force of settlement judgments.

*Id*. at 375 (quoting *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 381-82 (1985)).  The Court determined that giving preclusive effect to a judgment that disposed of exclusively federal claims did not undermine the federal courts' exclusive jurisdiction over securities actions; it observed that in an earlier case,

> we held that state court findings of fact were issue preclusive in federal patent suits.  We did so with full recognition that "the logical conclusion from the establishing of [the state law] claim is that Bechar's patent is void." . . . *Bechar* reasoned that although decrees validating or invalidating patents belong to the Courts of the United States," that "does not give sacrosanctity to facts that may be conclusive upon the question in issue." . . . Similarly, while binding legal determinations of rights and liabilities under the Exchange Act only, there is nothing sacred about the approval of suits arising under state law, even where the parties agree to release exclusively federal claims.

*Matsushita*, 516 U.S. at 384.

Appellant relies on the earlier Supreme Court case of *Pepper v. Litton*, cited above, for his argument that the bankruptcy court may ignore a state court judgment only when it was the product of fraud or jurisdictional defects.  *Pepper* does not mention Full Faith and Credit at all, but rather relies on the bankruptcy court's equitable power over the allowance or disallowance of claims.  308 U.S. at 303-07.

This court follows instead the Supreme Court's clearly-expressed discussion of the relationship between state judgments and preclusion under the Full Faith and Credit statute as set forth in *Kremer* and *Matsushita*.  *See also Heiser v. Woodruff*, 327 U.S. 726, 734 (1946)

("to the extent that the issue of fraud raised by the objections to petitioner's claim . . . has been litigated and decided before the bankruptcy court . . . that issue is now res judicata and may not further be litigated in the bankruptcy proceeding.").

If state law would give a judgment preclusive effect, then a court must determine whether Congress has created an exception to 28 U.S.C. § 1738. *In re Genesys Data Technologies, Inc.*, 204 F.3d 124, 128 (4th Cir. 2000). Courts have "seldom, if ever, held that a federal statute impliedly repealed [28 U.S.C.] § 1738." *Matsushita*, 516 U.S. at 380; *Kremer*, 456 U.S. at 477 (Congress must clearly manifest its intent to depart from 28 U.S.C. § 1738).

The bankruptcy court in this case did not analyze whether the bankruptcy laws worked a repeal of 28 U.S.C. § 1738, but rather determined that, in light of the Supremacy Clause, it must consider the cap in § 502(b)(4). *Siller*, 427 B.R. at 883. This approach has some support in case law. *See Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 872 (9th Cir. 2005) ("final judgments in state courts are not necessarily preclusive in United States bankruptcy courts"); *Browning v. Navarro*, 887 F.2d 553, 561 (5th Cir. 1989) ("bankruptcy courts have a job to do and sometimes they must ignore res judicata in order to carry out Congress' mandate"). For example, in *In re Networks Electronics*, the court considered the relationship between a state court judgment and the cap on claims stemming from the breach of an employment contract contained in § 502(b)(7):

> Once the bankruptcy court determined that the state court judgment resulted from the breach of an employment contract, that claim was subject to the application of an exception to allowance provided in the Bankruptcy Code. . . . Disallowance of the claim under §502(b)(7) is a matter of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const., art. I, § 8, cl. 4. To the extent that [the unsecured creditor] argues that state law should prevail over the Bankruptcy Code, such is not the case under the Supremacy Clause, U.S. Const. art. VI, § 2. Federal law preempts a state law or order which "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

195 B.R. at 97. And in *Kohn v. Leavitt-Berner Tanning Corp.*, 157 B.R. 523 (Bankr. N.D.N.Y.

1    1993), the court considered the cap on claims stemming from the breach of a lease agreement:

2    
3    
> Section 502(b) requires the bankruptcy court to undertake a two-part analysis.  First the court must "determine the amount of [a creditor's] claim as of the date of the filing of the petition . . ."  In such as the one at bar, this means accepting as non-reviewable the amount of the claim as determined by the state court.  This figure then forms the basis for the second part of the analysis, wherein the court determines how much of the claim should be allowed.  Applying the principles of equity inherent in the code, the court looks behind the judgment to ascertain the relationship between the parties.  When the parties stand as lessor and lessee, as in the case at bar, § 502(b)(6) applies.  This subsection applies a formula to which the previously determined judgment figure is applied, resulting in a second figure – the allowable portion of the original judgment.  This second figure represents Congress' view of what is equitable between a lessor and lessee in bankruptcy.

10   *Id*. at 527 (footnote omitted); *see also In re Kmart Corp*., 362 B.R. 361, 387 (N.D. Ill. 2007)

11   ("creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive

12   law creating the debtor's obligation, subject to any qualifying or contrary provisions of the

13   Bankruptcy Code").

14          Appellant argues that these cases cannot be controlling because in judgments

15   based on lease and employment issues, the creditors may have secured future damages which, if

16   accepted, would harm other creditors.  What appellant seeks, it continues, has nothing to do with

17   future damages, but rather payment for services rendered.  ECF No. 14 at 11-12.  While this

18   argument has logical appeal, it does not translate into a finding that the state court judgment is

19   necessarily entitled to preclusive effect in bankruptcy court.

20          However, even if this court does not accept the two part test of *Networks*

21   *Electronics* and *Kohn*, the court would not give *res judicata* effect to the Superior Court's

22   judgment.  As noted, this court must apply California's rules of preclusion.  *See, e.g., Kremer*,

23   456 U.S. at 466.  "In California, res judicata precludes a plaintiff from litigating a claim if:  the

24   claim relates to the same 'primary right' as a claim in a prior action, the prior judgment was final

25   and on the merits, and the plaintiff was a party or in privity with a party in the prior action."

26   /////

*Trujillo v. County of Santa Clara*, 775 F.2d 1359, 1366 (9th Cir. 1985).  Under California's primary rights theory:

> [A] cause of action is (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty devolving upon the defendant, and (3) a harm done by the defendant which consists of a breach of such primary right and duty. . . .[I]f two actions involve the same injury to plaintiff and the same wrong by the defendant, then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery.

*Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (internal citations, quotations omitted). The primary right is "plaintiff's right to be free from the particular injury suffered." *Mycogen Corporation v. Monsanto, Co.*, 28 Cal.4th 888, 904 (2002) (internal quotation, citation omitted). In bankruptcy claim proceedings, it is not at all clear that the debtor/defendant's "primary duty" has anything to do with the breach of contract: the claim allowance process in bankruptcy focuses less on the harm and more on the equities in the administration of the bankruptcy estate. *See Pepper*, 308 U.S. at 302-03; *compare Brown v. Felsen*, 442 U.S. 127, 133 (1979) (*res judicata* did not control proceedings on dischargeability of debt when debtor claimed the creditor should be unable to offer material outside the state record to prove fraud); *Genesys Data Technologies*, 204 F.3d at 128 (when no special bankruptcy defense is available, *res judicata* applies as it ordinarily would); *In re Dronebarger*, 2011 WL 350479, at *7 (Bankr. W.D. Tex. 2011) (§ 502(b)(6), similar in structure to (b)(4), is a defense to the proof of claim).

As the Court in *Brown* recognized, "[i]f in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to § 17, then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." *Brown*, 442 U.S. at 139 n.10.  In California, "collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." *Lucido v.*

/////

/////

20

1    *Superior Court*, 51 Cal.3d 335, 341 (1990).  There are five requirements that must be met before

2    an issue is collaterally estopped:

> 3    First, the issue sought to be precluded from relitigation must be
> identical to that decided in a former proceeding.  Second, this issue
> 4    must have been actually litigated in the former proceeding.  Third,
> it must have been necessarily decided in the former proceeding.
> 5    Fourth, the decision in the former proceeding must be final and on
> the merits.  Finally, the party against whom preclusion is sought
> 6    must be the same as, or in privity with, the party to the former
> proceedings.
>
> 7

8    *Id*.; *see also In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001) (applying collateral estoppel in

9    discharge proceedings).  These principles apply to private arbitration upon which judgment has

10   been entered so long as the application of the doctrine is fair and consistent with public policy.

11   *Vandenberg v. Superior Court*, 21 Cal.4th 815, 829 (1999); *In re Baldwin*, 249 F.3d 912, 919-20

12   (9th Cir. 2001).

13           Here, the bankruptcy court rejected the application of collateral estoppel, finding

14   the prior arbitration case did not satisfy the "necessarily decided" or "actually litigated"

15   requirements.  ER 79.  This court finds, however, that the court's analysis was not searching

16   enough.  First, the court determined that "case law has not yet resolved the respective parameters

17   of the § 502(b)(4) 'reasonable value' of services in comparison to state law."  *Siller*, 427 B.R. at

18   885.  It cited no law in support of this conclusion, even though there are cases to offer guidance.

19   Specifically, in California, a court evaluates the unconscionability of a contingent fee contract by

20   considering a number of factors: (1) the amount of the fee in proportion to the value of the

21   services performed; (2) the relative sophistication of the lawyer and the client; (3) the novelty

22   and difficulty of the questions in the litigation and the level of skill necessary to present the

23   client's position; (4) the likelihood that the lawyer's acceptance of the contract will preclude

24   other employment; (5) the amount involved and the results obtained; (6) any time limitations

25   imposed; (7) the nature and length of the professional relationship; (8) the lawyer's experience

26   and reputation; (9) whether the fee is fixed or contingent; (10) the time and labor involved; and

(11) the client's informed consent.  *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*,
187 Cal.App.4th 1405, 1419 (2010).  Even though the California Supreme Court has noted that a
contingent fee may be higher than what would be reasonable in an hourly-fee case, "[a]
contingent fee must be higher than a fee for the same legal services paid as they are performed.
The contingent fee compensates the lawyer not only for the legal services he renders, but for the
loan of those services."  *Ketchum v. Moses*, 24 Cal.4th 1122, 1132-33 (2001).  California courts
recognize the different measure of a contingent fee contract: "the lawyer runs the risk that even if
successful, the amount recovered will yield a percentage fee which does not provide adequate
compensation" and "agrees to delay receiving his fee until the conclusion of the case, which is
often years in the future.  The lawyer in effect finances the case for the client during the
pendency of the lawsuit.  If a lawyer was forced to borrow against the legal services already
performed on a case which took five years to complete, the cost of such a financing arrangement
could be significant."  *Cazares v. Saenz*, 208 Cal.App.3d 279, 288 (1989).  These differences do
not render a contingent fee contract automatically unreasonable.  Finally, California law
recognizes the relationship between a contingent fee contract and an otherwise "reasonable" fee
for services.  *See Villa v. Hudgins*, 151 Cal.App.3d 515 (1984) (in determining whether a fee is
reasonable under Cal. Civ. Code § 1717, court may consider a contingency fee arrangement as
evidence of the value of the attorney's services); *see also Comerica v. Smith (In re Magna Cum
Latte, Inc.*), No. 07-31814, 2008 WL 2047937, at *10 (Bankr. S.D. Tex. May 9, 2008) (relying
on California law to give "significant weight" to contingent fee agreement because the
agreement relied on relevant lodestar adjustment factors).

          Under § 502(b)(4), "the term 'value' . . . is synonymous with the concept of
'market value' or 'price' such that an attorney is entitled to fees up to the reasonable market
value of his services."  *In re Food Management Group*, 2008 WL 2788738, at *5 (Bankr.
/////
/////

S.D.N.Y. 2008).  In determining fees under § 502(b)(4), a bankruptcy court considers:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. (3) The fee customarily charged in the locality for similar legal services. (4) The amount involved and the results obtained. (5) The time limitations imposed by the client or by the circumstances. (6) The nature and length of the professional relationship with the client. (7) The experience, reputation, and ability of the lawyer or lawyers performing the services. (8) Whether the fee is fixed or contingent.

*In re Nelson*, 206 B.R. 869 (Bankr. N.D. Ohio 1997); *see also In re Ellipso*, 2011 WL 482725, at *4-7 (using general factors, not specifically tailored for bankruptcy court, in determining whether salary of insider was reasonable).  The contingent nature of services cannot be ignored:

> Contingency agreements . . . provide reasonable alternatives to the hourly retainer, despite the fact that, as a result of their contingent and risky nature, such agreements typically generate fees (if at all) substantially in excess of their more conservative counterparts. Thus, in other settings, where the bankruptcy court has ignored a debtor's reasonable contingency fee obligation and, instead, substituted its own determination of a (much lower) reasonable hourly fee, appellate courts have reversed and directed payment in accordance with the terms of the contingency fee agreement.

*In re Western Real Estate Fund*, 922 F.2d at 597-98.

The similarity between the standard for determining the unconscionability of a contingent fee agreement, which was before the arbitrator, and the bankruptcy court's standard for determining the reasonable value of the fees suggests that the issue of an appropriate fee for appellant's work was necessarily determined and actually litigated in the formal arbitration that took place here.  As noted above, the similarity between the considerations of "reasonable value" and the unconscionability of a contingent fee contract in California also suggests the question was necessarily decided.  *See In re SNTL Corp.*, 571 F.3d 826, 845 n.20 (9th Cir. 2009) (recognizing that California's attorney's fees provisions "impose requirements in the nature of reasonableness").

/////

1    Secondly, the bankruptcy court also determined that the issue of an appropriate

2   fee was not actually litigated because appellant "successfully resisted Siller's effort to defend the

3   arbitration on the ground that the fees were not 'reasonable.'" ER 80.   Although it is not

4   entirely clear, the court appears to have relied on the arbitrator's citation to *Ketchum*, 24 Cal.4th

5   at 1132.  However, as noted above, *Ketchum* does not hold that fees paid under a contingency fee

6   contract are unreasonable; rather, it recognizes that the measure of reasonableness may be

7   different in a contingency case: "'[a] lawyer who bears both the risk of not being paid and

8   provides legal services is not receiving the fair market value of his work if he is paid only for the

9   second of these functions.'" *Id.* at 1133 (quoting Leubsdorf, *The Contingency Factor in Attorney*

10  *Fee Awards*, 90 YALE L.J. 473, 480 (1981)).[7]  Here, the bankruptcy judge did not consider the

11  transcript of the arbitration proceedings in determining what was before the arbitrator.  This

12  court directed the parties to lodge the transcript and takes judicial notice of it in resolving the

13  estoppel issue.  *See Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282-83 (9th Cir.

14  1986), *overruled on other grounds by Astoria Federal Savings & Loan Ass'n v. Solimino*, 501

15  U.S. 104 (1991).

16    During the arbitration, appellant's lawyer argued that the only issue was the

17  breach of contract.  Appellee's lawyer argued that "even in a contract case, the contract claims

18  are not absolute," because "the case law says that even if you have a contract that says I'm going

19  to get X percent, you still have to show you put forth reasonable effort in which you did for it to

20  justify the fee."  ART 201.  Through the course of the arbitration, both appellant's and appellee's

21  lawyers explored all of the following:  the undertaking by both Pitre and Spiller, focusing on

22  Siller's litigation history, the length of the relationship, the results of the litigation, the risks

23  involved with the dissolution litigation, the difficulties attendant on the malpractice action

24  ─────────────

25    [7]  *Ketchum* considered the proper method for calculating attorneys' fees for a successful
    plaintiff in a SLAPP action and recognized that the contingent nature of recovery, and thus of the
    opportunity to seek recovery for fees, was a proper consideration as part of the adjustment of the
26  lodestar fee amount.

against Friedburg; the difficulties in seeking to enforce the buy/sell agreement; Spiller's decision to associate with Pitre in order to pursue litigation on the buy/sell agreement and to participate in the dissolution and Friedburg malpractice actions; and counsels' hourly rates for themselves, their associates and their paralegals. ART[8] 74- 77 (over the course of five years, Pitre represented Siller on the corporation dissolution, the buy/sell agreement, the Friedburg malpractice action and a lawsuit filed by lawyers Hauser and Thomas); ART 82 (strategic considerations in dissolution case); ART 121-122 (Spiller associated with Pitre to litigation the buy/sell case, which Pitre described as a "very difficult case" and to join in the remainder of the litigation);  ART 101-102 (impact of taped conversations on Friedburg malpractice action); ART 121 (buy/sell challenge "very difficult case" and so Pitre not included to pursue it); ART 122-123 & 376-377 (Spiller's association, from 2004 to 2007); ART 177-179 & 393 (hourly rates for both firms); ART 244-248 (Spiller's efforts on the buy/sell litigation & novelty of the approach); ART 377-378, 393, 440-442 (Spiller's work on the case, including the development of theories for the buy/sell case, participation in the dissolution case and the malpractice claim against Friedburg; from the day Spiller associated with Pitre he "did the same thing" and "came in full bore," participating in both the dissolution and buy/sell trials); *see also* ART Ex. 3 (case status update noting the risk of dismissal of the dissolution case, in part because of the "litigious history of Chuck Siller and the antics of his prior counsel has incurred the wrath of both trial and appellate courts," describing the cases as "a Pandora's Box of legal issues and a client who is difficult to deal with").

Before the arbitration, Siller brought several motions in limine.  They chiefly challenged the validity of the two fee contracts and sought to present experts about the valuation of the properties that Siller accepted in settlement of the dissolution case and which formed the basis for calculation of the contingencies; these motions were denied.  ART 201, 260 (motions in

---

[8]  ART refers to the transcript of the arbitration proceeding lodged in electronic form.

limine denied), 270 (arbitrator disinclined to take testimony regarding the valuation of the property); *see also* ER 223-227 (arbitrator's description of the motions in limine).  In addition, the arbitrator allowed Siller's lawyer to pursue questions about the number of hours appellants spent on portions of the litigation and their attitude toward it, even over appellants' objections. ART 224-225.  When appellants' counsel continued to object to questions about the time appellants spent on the litigation and the success or failure of those efforts, Siller's counsel argued that the questions were "completely relevant as to conscionability, whether or not this is an unconscionable fee based upon what they promised to do at the beginning and what they failed to do at the end." ART 296.  The arbitrator let the questioning proceed, subject to a motion to strike.  ART 299.  There is no indication that appellants later sought to strike the information thus developed.

In reaching his ultimate determination, the arbitrator reviewed the nature of the work and the risk that appellant would not be paid, reflecting the evidence developed about the reasonable value of the contingent fee contract.  ER 235-240.  The arbitrator noted that appellee's counsel, Mr. Wass, cross-examined about the work performed over objection, but as described above, the examination was allowed.  Finally, the arbitrator rejected appellee's claim that the contingency fee contracts in this case were unconscionable.  ER 241.  By considering both the reasonable nature of the contingent fee contracts and rejecting the claim that the contracts were unconscionable, and applying California's tests for both determinations, the arbitrator necessarily decided that the fees were reasonable within the contemplation of § 502(b)(4).

The order of the bankruptcy court is REVERSED.  This case is remanded for further proceedings consistent with this order.

DATED: May 9, 2012.

_____
UNITED STATES DISTRICT JUDGE