1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   COTCHETT, PITRE & McCARTHY and            No.  CIV. S-10-0779 KJM
     SPILLER • McPROUD,
12
                       Appellants,
13
            v.
14
     CHARLES W. SILLER,
15
                       Appellee.
16

17   COTCHETT, PITRE & McCARTHY and            No.  CIV. S-10-0780 KJM
     SPILLER • McPROUD,
18
                       Appellants,
19
            v.
20
     CWS ENTERPRISES, INC., a California
21   Corporation,

22                     Appellee.

23

24   In re CWS Enterprises, Inc.,

25                     Debtor,

26

27

28
                                        1

Spiller • McProud

             Appellants,

     v.

CWS Enterprises, Inc., et al.,

             Appellee.

No.  CIV. S-12-142 KJM

ORDER

And consolidated appeals and cross-appeals.

      This case stems from debtor Charles Siller's failure to pay his attorneys following their success in securing the dissolution of a family farming company and recovery of a judgment valued at $30.5 million in cash and real property.  The pending motions for reconsideration and the appeals arise from the bankruptcy court's resolution of Spiller • McProud's claim for pre-petition legal fees stemming from the dissolution litigation, which had been reduced to a state court judgment following arbitration.  At the heart of these proceedings is statutory language found at Title 11 U.S.C. § 502(b)(4), which provides that after hearing, a bankruptcy judge shall allow a claim "except to the extent that . . . if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services."  Section 502(b)(4).

      As an initial matter, the court considers the Trustee's and Siller's motions for reconsideration of this court's order granting leave to appeal, and DENIES those motions.

      On March 1, 2013, the court heard argument on the cross appeals of a judgment entered by the bankruptcy court following a bench trial on the merits of the Trustee's objection to Spiller • McProud's ("Spiller") claim under section 502(b)(4).  Both Spiller and the Trustee have appealed the bankruptcy judge's ruling.  At hearing, Bradley Benbrook appeared for the Trustee, David Flemmer; Andrea Porter appeared for the debtor; and Walter Dahl and Steven Spiller appeared for Spiller • McProud.

      In the order below, the court resolves the cross appeals and the pending substantive motions for reconsideration.  It DENIES the Trustee's and Siller's motions for reconsideration of this court's order of May 10, 2012, which determined that a state arbitration

award, reduced to judgment, was entitled to preclusive effect. The court thus reverses the

bankruptcy court's order of January 3, 2012.  The court affirms the bankruptcy court's December

2011 order  to the extent it found Spiller's and CPM's request for their fees at the conclusion of

the dissolution action was not misconduct; the court thus DENIES the Trustee's appeal.

I.  Background

On June 8, 2009, Charles Siller and CWS filed Chapter 11 bankruptcy petitions in this district in

April 2009.  *In re CWS Enterprises, Inc.*, No. 09-26849-C-11 (*CWS Docket*), ECF No. *1; In re

Charles W. Siller*, No. 09-26167-C-11 (*Siller Docket*), ECF No. 1.[1]  On Schedule D in each

action, appellees listed Spiller • McProud's judgment liens in the amounts of $2,582,621.00 and

$11,965,608.95, respectively.  *CWS Docket*, ECF No. 20; *Siller Docket*, ECF No. 26.  David

Flemmer was appointed Trustee in the CWS case on June 23, 2009.  Siller is debtor-in-possession

in his case.

On June 8, 2009, Spiller and Cotchett, Pitre & McCarthy (CPM) filed a joint

creditors' claim in the total amount of $12,126,302.80, with $11,690,704.32 listed as principal

and $435,598.48 in interest as of April 10, 2009.  Excerpt of Record (EOR) 363-377.

On February 2, 2010, Spiller filed a motion for summary judgment in the

bankruptcy actions, seeking an order dismissing appellees' objection to its claim or, in the

alternative, to allow the claim as a final, non-contestable judgment.

On February 10, 2010, debtor filed an opposition to the Cotchett/Spiller motion for

summary adjudication or to allow the claim, as well as a counter-motion for partial summary

judgment.  *CWS Docket*, ECF No. 312; *Siller Docket*, ECF No. 199.

On February 24, 2010, the CWS Trustee filed an opposition/objection to the

Cotchett/Spiller motion.  *CWS Docket*, ECF No. 334.

On March 22, 2010, the bankruptcy judge denied the Cotchett/Spiller claimants'

motions and granted debtor's cross-motion.  *CWS Docket*, ECF No. 355; *Siller Docket*, ECF

/////

---

[1] The court takes judicial notice of the records of the bankruptcy court in these cases.

1   No. 212.  The written order was issued on April 9, 2010.  *Siller Docket*, ECF Nos. 226-227; *CWS*

2   *Docket*, ECF Nos. 408-409.

3       Spiller and CPM appealed to this court, but while the appeal was pending, CPM

4   reached a settlement with debtor and the Trustee and the appeal was dismissed as to CPM.

5   District Court Dockets, Civ. No. 10-779, ECF No. 20 & Civ. No. 10-780, ECF No. 28.

6       In addition, while the appeal was pending, the bankruptcy court held a bench trial

7   on the merits of the Trustee's objection to Spiller's claim and concluded that the reasonable value

8   of the services Spiller provided to debtor was $440,250.  12/19/11 Reporter's Transcript (RT) at

9   52.  Spiller appeals, arguing that this determination is at odds with this court's resolution of the

10   appeal from the summary judgment proceedings.  The Trustee and debtor appeal, arguing that the

11   reasonable value of Spiller's services is actually nothing.

12       On May 10, 2012, this court reversed the bankruptcy judge's resolution of the

13   motion for summary judgment.  Dist. Ct. Dkts. 10-779, 10-780, ECF Nos. 33, 42.

14       The Trustee and Siller seek reconsideration of this order.  In addition, both Spiller

15   on one hand and the Trustee and Siller on the other challenge the bankruptcy judge's resolution of

16   the adversary proceeding below.

17   II.  Motion For Reconsideration of Leave to Appeal[2]

18       A.  Standard of Review

19       A party may file a motion for rehearing, specifying the points of fact or law it

20   believes the court overlooked.  FED. R. BANKR. P. 8015; *see* FED. R. APP. P. 40(a)(2).  "'Whether

21   or not to grant reconsideration is committed to the sound discretion of the court.'"  *In re Fowler*,

22   394 F.3d 1208, 1214 (9th Cir. 2005) (quoting *Navajo Nation v. Norris*, 331 F.3d 1041, 1046 (9th

23   Cir. 2003)).  "A motion for rehearing is not a means by which to reargue a party's case or assert

24   new grounds for relief."  *Corwin v. Gorilla Co., LLC* (*In re Gorilla Co. LLC*), Nos. CV–10–

25   01029–PHX–DGC, AP–09–00266–RJH, BK–09–02898–RJH, BK–09–02901–CGC, BK–09–

26   */////*

27

28       [2] Spiller did not file a separate response to the motion for reconsideration, but rather addressed the order in its brief on appeal from the bankruptcy court's judgment after trial.

1   02903–GBN, BK–09–02905–CGC, 2011 WL 2357825, at *1 (D. Ariz. June 14, 2011) (internal

2   citations & quotation marks omitted).

3        B.   Analysis

4            The Trustee and Siller argue that this court should dismiss the appeal from the

5   summary judgment proceedings as improvidently granted because the appeal did not advance the

6   policies of avoiding wasted litigation and materially advancing the ultimate termination of

7   litigation.  Dist. Ct. Dkt. 10-780, ECF No. 45 at 12 & ECF 47.

8            Consideration of an interlocutory appeal is appropriate when refusal to hear the

9   appeal would result in wasted litigation and expense, the appeal involves a controlling question of

10  law which is not firmly settled and the appeal would advance the ultimate termination of the

11  litigation. *Linda Vista Cinemas LLC v. Bank of Ariz.* (*In re Linda Vista Cinemas, LLC*), Nos. CV

12  10–786–TUC–CKJ, BK 4:10–14551–JMM, 2011 WL 1743312, at *2 (D. Ariz. 2011) (citing,

13  inter alia, *Official Committee of Unsecured Creditors v. Credit Lyonnaise Bank* (*In re NSB Film*

14  *Corp.*), 167 B.R. 176, 180 (BAP 9th Cir 1994)).  A court may dismiss an appeal as improvidently

15  granted when these goals may no longer be served.  *Van Meter v. Barr*, 976 F.2d 1 (D.C. Cir.

16  1992).  That said, while "the fact that the litigation may later take a twist or turn that demotes the

17  'controlling' question's significance . . . would permit us to dismiss the appeal as having been

18  improvidently granted. . . .  But it would not require us to do so . . . ." *Johnson v. Burken*, 930

19  F.2d 1202, 1205 (7th Cir. 1991) (recognizing that appellate jurisdiction is determined by the facts

20  that exist when the appeal is filed).  Given the pendency of the appeal before this court, it is not

21  clear why Spiller did not seek a stay of the bankruptcy trial on this claim, to further the goal of

22  avoiding wasted litigation.  Even so, the court declines to find leave to appeal to have been

23  improvidently granted, as the question presented was not settled.  *See Belice v. Belice* (*In re*

24  *Belice*), 461 B.R. 564, 572 (BAP 9th Cir. 2011) (stating that judicial economy will be served by

25  an interlocutory appeal on an unsettled question).

26           The court DENIES the motions for reconsideration.

27  /////

28  /////

5

1    III.  Cross Appeals

2         A.  Standard of Review

3              A district court may "affirm, modify, or reverse a bankruptcy judge's judgment,

4    order, or decree or remand with instructions for further proceedings."  FED. R. BANKR. P. 8013.

5    The court reviews "'the bankruptcy court's findings of fact under the clearly erroneous

6    standard[,] . . . its conclusions of law *de novo*,'"  *Clinton v. Acequia, Inc.* (*In re Acequia, Inc.*),

7    787 F.2d 1352, 1357 (9th Cir. 1986) (quoting *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.

8    1986)), and "[m]ixed questions of law and fact . . . *de novo*."  *Beaupied v. Chang (In re Chang)*,

9    163 F.3d 1138, 1140 (9th Cir. 1998).  Rulings regarding issue preclusion are mixed questions of

10   law and fact, in which legal issues predominate.  *Khaligh v. Hadaegh* (*In re Khaligh*), 338 B.R.

11   817, 823 (9th Cir. B.A.P. 2006).

12             "'A finding is "clearly erroneous" when although there is evidence to support it,

13   the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake

14   has been committed.'"  *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (quoting *United

15   States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *see also Savage v. Greene (In re Greene)*,

16   583 F.3d 614, 618 (9th Cir. 2009).

17             This court may affirm on any ground supported by the record.  *Thrifty Oil Co. v.

18   Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003).

19        B.  The Bankruptcy Trial on the Merits

20             i.  The Evidence at Trial[3]

21             The fee dispute between Spiller and the debtor arose from debtor's long-standing

22   attempts to dissolve Siller Brothers, which owned forest and agricultural property throughout

23   Northern California.  12/19 RT at 22, 32.  In making its findings, the bankruptcy court observed

24   that the attempted dissolution process started in the mid-1990s.  Initially Attorney Freidberg

25   represented debtor but during the course of the litigation, debtor hired Attorneys Dennis Hauser

26   _____

27        [3]  The earlier appeals were decided on the record of the cross-motions for summary
     judgment.  The court relied on some of the same documentary evidence during the trial on the
28   adversary proceedings, but heard testimony as well.

1   and Randy Thomas. 1/3 RT at 41; Excerpt of Record (EOR) at 46.  None of these attorneys were

2   successful in their litigation on debtor's behalf.   1/3 RT at 41.  Indeed, when debtor retained

3   CPM, debtor was not only pursuing the dissolution action against Siller Brothers, but was dealing

4   with Freidberg's claim for fees, ranging from $1.2 to $4 million, and a claim from Attorneys

5   Hauser and Thomas for $2 million in fees.  12/19 RT at 92-93.  Even the Trustee's expert witness

6   agreed that CPM had taken on a mess.  12/19 RT at 142.

7            Debtor's agreement with CPM provided, among other things, that debtor was

8   retaining CPM "in litigation involving SILLER BROTHERS, a California general partnership;

9   SILLER BROTHERS, INC., a California Corporation; ANDREW SILLER; NEAL SILLER; or

10  any of their affiliates or subsidiaries and the Freidberg LAW CORPORATION."  EOR at 58.

11  The agreement memorialized debtor's "desire to finalize all litigation and bring peace to [him]     .

12  . . "  and his belief that "if the legal malpractice case is resolved with Freidberg, then the

13  dissolution can be obtained free of a lien from the Freidberg Law Corporation."  EOR at 61.

14  Debtor further sought "to engage the services of the ATTORNEYS to resolve any monies due

15  Thomas or Hauser."  EOR at 62.  The agreement described debtor's litigation, including a

16  malpractice action against Freidberg's firm, and an acknowledgment that there were judgments

17  against debtor, totaling almost $10 million.  EOR at 61.   It continued:

18              Recognizing the services to be rendered, CLIENT is willing to pay
               a underscore{percentage} of anything he receives by way of settlement,
19             judgment or distribution out of the litigation or any subsequent
               bankruptcy proceeding.  He is without funds to pay hourly fees and
20             cannot otherwise bring or conclude the litigation.   CLIENT has
               reviewed the above litigation with his personal attorney,
21             WILLIAMSON . . . .

22  EOR at 62 (emphasis in original).  The agreement provided that

23              the contingent fee in this matter will be based upon what sum,
               either in cash, notes, personal property, real property, or any
24             combination, [debtor] is to receive from the Corporation by way of
               settlement, verdict or distribution–after deducting what he owes to
25             the Corporation, partnership, and Andrew and Neal Siller, any
               Freidberg liens or attorney liens from Thomas or Hauser.  Hence,
26             any sum that he is left with after deducting what he owes (estimated

27  /////

28

1  at $10 million in judgments) and the stated attorney liens and <u>before</u>
2  any taxes—he will pay the agreed upon percentage set forth below
   to ATTORNEYS.

3  EOR at 62-63 (emphasis in original).  Thereafter debtor acknowledged that he agreed "to the sum

4  of 28% of the net amounts, either cash, notes, personal property, real property, or a combination

5  thereof, recovered by settlement, compromise, or trial of the corporate dissolution action . . . and

6  the malpractice action . . . ."  EOR at 64; 12/19 RT at 91.  Should a settlement or verdict involve

7  the distribution of assets other than cash, CPM's percentage fee would be based on the fair market

8  value of the assets.  EOR at 65.  In addition, the agreement provided that "[a]ssociate counsel

9  may be employed at the discretion and expense of the ATTORNEYS, but the fees of associate

10 counsel shall not be an additional expense to the CLIENT and shall be deducted from the fees

11 paid to [CPM]."  EOR at 66; 12/19 RT at 79.   Finally, the agreement provided "that the law firm

12 may retain fees and costs out of the amounts collected by settlement or judgment."  EOR at 67.

13         Before Spiller became involved with debtor's litigation, Terrance Keeley served as

14 co-counsel with CPM in the dissolution case and signed debtor's agreement with CPM.  12/19 RT

15 at 101-102; EOR at 71.  Keeley was to receive thirty percent of  CPM's contingency fee.  12/19

16 RT at 102-103.  He later withdrew from the case and did not claim any fees.  12/19 RT at 103.

17         Spiller met debtor because debtor was a percipient witness in another of Spiller's

18 cases.  After that initial meeting, he represented debtor in an unrelated matter on a contingency

19 basis.  12/19 RT at 21.  During this earlier representation, debtor wished to discuss the pending

20 litigation to dissolve Siller Brothers, but Spiller was reluctant to do so, aware that CPM

21 represented debtor in that effort.  12/19 RT at 22, 63.

22         Debtor hired Spiller in May 2004.  12/19 RT at 24.  Spiller incorporated debtor's

23 agreement with CPM and drafted a separate agreement with debtor, which included a contingency

24 fee of eight percent on top of CPM's fee.  Spiller reviewed it with debtor and with the person who

25 accompanied debtor.  12/19 RT at 26; EOR at 15.

26         In his agreement with debtor, Spiller said, "You have asked me and my law firm to

27 provide assistance and advice to you concerning your current lawsuit against Siller Brothers, Inc.,

28 in the Sutter County Superior Court for dissolution of the corporation."  EOR at 14.  He described

1   his role "as your general counsel to communicate to the Cotchett Law Firm your ideas,

2   suggestions and requests concerning trial strategy, trial preparation (including selection of

3   experts) and conduct of the trial itself." 12/19 RT at 70; EOR at 14.  Spiller also described his

4   role "not as [an] additional trial attorney[], but to assist, advise and discuss these legal matters

5   personally with [debtor] and as an interface with the attorneys at the Cotchett law firm." EOR at

6   14.  He noted debtor's concern that  CPM "does not appear to be pursuing the August 28, 1959

7   Buy/Sell stock purchase agreement," which debtor believed gave him and his brother Neil the

8   right to purchase shares owned by their now deceased brother Andy "for a small fraction of what

9   they are worth." EOR at 14.  The agreement further said that debtor had discussed paying Spiller

10  "a contingency fee of $3,000,000.00 out of the proceeds that you would receive from the

11  litigation," but ultimately that Spiller and his firm "agree to assist you as I have describe[d] in this

12  agreement for a contingency fee of eight percent (8%) of the 'Net Amounts' recovered by

13  settlement, compromise or trial under the same definition you have agreed with the Cotchett firm

14  . . . ." EOR at 15.  Spiller knew the case "had many moving parts, particularly when we brought

15  the buy/sell issue" and that it would be both interesting and risky.  12/19 RT at 50.

16          In June 2004, Spiller wrote a letter for debtor's signature, introducing Spiller to

17  CPM. 12/19 RT at 74.  In it debtor says he has retained Spiller to counsel him in his personal

18  affairs and to assist him to understand fully the Siller Brothers dissolution litigation.  12/19 RT at

19  73; EOR at 74.  He continued that "my retaining of Mr. Spiller should not interfere in the slightest

20  with your representation of me.  You and your firm are my trial attorneys." EOR at 74 (emphasis

21  in original).   He asked the attorneys from CPM to meet with Spiller "so that [Spiller] can become

22  acquainted with you and determine how we can best assist you to prepare for trial."  EOR at 74.

23          In October 2004, debtor signed an amendment to the representation agreement,

24  which did not increase the contingent fee.  12/19 RT at 29-30.

25          Spiller initially was not sure how CPM would react to debtor's retaining him, but

26  was pleasantly surprised when he was welcomed.  12/19 RT at 77.  He ultimately did not restrict

27  himself simply to advising and acting as an interface, but actively participated in trial.  12/19 RT

28  /////

9

1  at 77-78.  Spiller and CPM did not discuss whether Spiller's fee should be paid out of CPM's 28

2  percent and Spiller did not sign an association of counsel.  12/19 RT at 79.

3          Among the tasks debtor wished Spiller to undertake was to convince CPM to

4  pursue a buy/sell action against Neal Siller.   Spiller had doubts that the buy/sell action would be

5  successful. 12/19 RT at 72.  In conjunction with CPM, he ultimately brought an unsuccessful

6  action based on the theory that Andy Siller's death and the buy/sell agreement gave debtor and

7  his brother Neal the right to purchase Andy's shares of Siller Brothers for a small fraction of their

8  value.  EOR at 4.  Spiller's billing records do not reflect how much time he spent on the buy/sell

9  action, apart from the unsuccessful four day trial on the action, which overlapped with the

10  dissolution case to some extent.  12/19 RT at 86, 88.[4]  In connection with the buy/sell litigation,

11  Spiller helped debtor look for financing to purchase the shares in anticipation of success on the

12  litigation.  12/19 RT at 87-88.

13          Spiller also worked on debtor's ultimately unsuccessful malpractice action against

14  prior counsel Freidberg.  12/19 RT at 90.

15          Finally, Spiller worked with CPM on the Siller Brothers dissolution, which

16  resulted in the superior court's determination that debtor's interest in Siller Brothers was in

17  excess of $45 million.  12/19 RT at 31.  After the trial court ruling on summary judgment and

18  before the trial on the involuntary dissolution, however, Siller Brothers elected to buy debtor out,

19  so the case proceeded on appraisals only.  12/19 RT at 84.

20          Spiller participated in the appraisal proceedings, along with Frank Pitre and Ara

21  Jabagchourian.  12/19 RT at 31.  One of Spiller's roles was to present testimony regarding the

22  value of Siller Brothers' timber property and forest stands, which his witness valued at $84

23  million dollars.  12/19 RT at 32-33.  The trial judge accepted this valuation, rejecting Siller

24  Brothers' estimated value of $39 million.  12/19 RT at 32-33.  Siller Brothers listed the timber

25  valuation as one issue in its cross-appeal from the judgment, believing that all the timber property

26  should be valued as a single business rather than parcel by parcel.  12/19 RT at 113.

27  _____

28          [4] Spiller's billing records did not separate his time by the different cases for debtor.  12/19
RT at 83.

1        Spiller also worked out a Section 355 spin-off for reorganization of Siller Brothers,

2   based on Internal Revenue Code section 355, as a way of avoiding tax liability for debtor;

3   although Siller Brothers opposed this approach at first, it was eventually adopted during

4   settlement.  12/19 RT at 33, 35-36.

5        Siller Brothers appealed the trial court's valuation; debtor cross-appealed on the

6   failure to accept a 355 spin-off, among other things.  12/19 RT at 37.  The case was never briefed,

7   but rather went directly to settlement and was resolved in May 2007.  12/19 RT at 37.  The

8   settlement was ready to be finalized in June or July 2007; it took into account a $10 million

9   judgment Siller Brothers had against debtor.  12/19 RT at 38.   The settlement awarded debtor

10  $30.5 million, which was deposited into an escrow account, subject to this judgment and another

11  creditor's judgment, as well as liens from Thomas and Hauser, Freidberg and the Franchise Tax

12  Board.  12/19 RT at 38-39, 41.

13       Pitre, Spiller, debtor and debtor's accountant discussed the disbursements to be

14  made out of escrow to make sure debtor would have enough money for his agricultural properties

15  until they started to produce more income.  12/19 RT at 40; EOR at 81.  All agreed the

16  disbursement would be sufficient for debtor's needs.  12/19 RT at 40; EOR at 81.  When debtor

17  later said he needed more cash for his business, CPM and Spiller orally agreed to accept reduced

18  fees from escrow, with deeds of trust on debtor's property securing the rest.  EOR at 81.

19  Ultimately Siller refused to sign an escrow instruction directing the bank to disburse attorneys'

20  fees to CPM and Spiller.  12/19 RT at 39.  CPM and Spiller withdrew as counsel because debtor

21  reneged on his agreement to pay them out of the escrow.  12/19 RT at 100; EOR at 75-82.

22       At the time CPM and Spiller withdrew, there was a summary judgment motion

23  pending in the Thomas-Hauser case, set to be heard in July or August 2007, and an appeal

24  pending in the Freidberg case.  12/19 RT at 42; EOR at 77.  According to Spiller, the resolution

25  of the Thomas, Hauser and Freidberg cases was not a prerequisite to its being paid: the money

26  was due when debtor received value.  12/19 RT at 92.  As noted below, the Trustee's expert

27  disputes this characterization.  *See* page 13 *infra.*

28  /////

1    Spiller calculated that he spent 1760 hours on all aspects of representing debtor,

2  though in answers to interrogatories, he said that the total number of compiled hours the lawyers

3  and paralegals at his firm spent on debtor's cases was 1761.  12/19 RT at 47, 53.  Although

4  Spiller kept time records, he did not write down all his time for a variety of reasons.  12/19 RT at

5  48.  Debtor required "a lot of hand-holding": he would show up, often with other people, and

6  request an explanation of certain things or that certain things be pursued.  12/19 RT at 48-49.

7  During the three years he was involved, he spent perhaps a third of his time on debtor's case.

8  12/19 RT at 51.  His average hourly rate at that time was $225 to $250 an hour.  12/19 RT at 55.

9    Martin Dodd has represented Siller Brothers while at his current firm, Futterman,

10  Dupree, Dodd, Croley, Maier, and also with a prior firm.  12/19 RT at 105-106.  In 2004, the

11  superior court decided a summary judgment motion in debtor's 2001 dissolution action and

12  shortly after that Siller Brothers exercised its rights under the Corporation Code to avoid a

13  dissolution by buying debtor's shares.  12/19 RT at 106-107.  Accordingly, the only issue

14  remaining was the value of debtor's interest.  12/19 RT at 107-108.  In the seven years his firm

15  represented Siller Brothers in the dissolution action, its total hourly fees were approximately $1.2

16  million, with half incurred before the summary judgment ruling and half after the ruling.  12/19

17  RT at 108.  In the course of his representation of Siller Brothers, the idea of using Internal

18  Revenue Code Section 355 to create an entity through which debtor could receive his interest first

19  arose in 1995.  12/19 RT at 109.  At that point, Dodd met with Freidberg and debtor and proposed

20  they structure a tax free reorganization; thereafter the subject came up repeatedly as they

21  attempted to resolve the case.  12/19 RT at 109.  Siller Brothers opposed this in the latest

22  corporate dissolution litigation because the superior court judge did not have the authority under

23  the statute to order the creation of a § 355 organization.  12/19 RT 110.  In addition, Siller

24  Brothers advocated that the value of debtor's 40 percent share be reduced by a hypothetical

25  capital gain because that is the method the appraisers advocated.  12/19 RT at 110-111.

26    Attorney James Wagstaffe, qualified as an expert on attorneys' fees, was asked to

27  provide his opinion on the reasonable value of Spiller's services.  He examined CPM's

28  contingency agreement as well, to the extent it was relevant to evaluating Spiller's claim.  12/19

1    RT at 122.  Wagstaffe reviewed a number of documents, including Spiller's billing records,

2    which he described as vague and ultimately of no assistance in evaluating the reasonable value of

3    Spiller's services.  12/19 RT at 125-126.  He also reviewed the letters of May 24 and June 2, 2004

4    between Spiller and the debtor, and the October amendment to the retainer agreement.  12/19 RT

5    at 127.

6              In Wagstaffe's opinion, Spiller was performing the work of associate counsel for

7    the most part.  12/19 RT at 129.  For example, Spiller conducted some depositions and attended

8    others, all things CPM was competent to do and which fell within their agreement with debtor.

9    12/19 RT at 129-130.  In Wagstaffe's opinion, a general counsel does not go to depositions and

10   does not try the case, but rather provides "a translation, if you will, when you need it or if there is

11   something you think your counsel is not searching for."  12/19 RT at 131-132.  Approximately

12   five percent of Spiller's time was spent talking to debtor, which is at the heart of his role as

13   general counsel.  12/19 RT at 132.

14             Wagstaffe also believed that CPM had contracted to undertake the additional

15   buy/sell litigation.  Wagstaffe concluded that CPM had "agreed to do the corporate dissolution,

16   the Freidberg malpractice, the resolution of the liens with Freidberg and Thomas & Hauser and

17   the buy/sell agreement . . . ."  12/19 RT at 130. Wagstaffe interpreted debtor's agreement with

18   CPM to mean that debtor did not owe any fees until disputes with Freidberg, Hauser and Thomas

19   were resolved and liquidation of the Siller Brothers litigation had occurred.  12/19 RT at 128.  As

20   Wagstaffe explained, because the fees were to be calculated "minus" what was owed to prior

21   counsel, the fees for CPM and Spiller could not be calculated until the amount of fees for prior

22   counsel were ultimately resolved.  12/19 RT at 128, 136.  Accordingly, when CPM sought

23   payment from the escrow fund resulting from the Siller Brothers' litigation, general counsel's role

24   would be to question whether CPM earned its money.  12/19 RT at 133.  For example, at the

25   escrow, debtor's sister told him not to sign the part about the fees and so debtor crossed out the

26   instruction.  At that point, Spiller should have listened to his client and perhaps taken some action

27   giving debtor leverage.  In addition, he should have considered CPM's fee agreement and

28   determined whether CPM was entitled to fees as part of escrow or at some other time.  12/19 RT

1    at 136.  However, the emails between Pitre and Spiller were more concerned about their own fees,

2    which caused Wagstaffe to question whether Spiller was fulfilling general counsel role.  12/19 RT

3    at 136.  He further castigated Spiller for withdrawing and for not remonstrating with CPM for

4    withdrawing while the Freidberg, Hauser and Thomas liens were still pending, because these

5    were substantial liens.  12/19 RT at 137.  Moreover, if CPM and Spiller received their fees from

6    escrow before the resolution of prior counsels' suits, there was "a risk of them [sic] losing

7    incentive to actually go after these numbers and reduce them further."  12/19 RT at 137.

8            Wagstaffe also believed that to the extent Spiller acted as associate counsel, his

9    services were duplicative and so not reasonable.  Although a client may hire more lawyers than he

10   needs, the role of the bankruptcy court under section 502(b)(4) is to determine whether the

11   duplication was reasonable.  Here, Spiller did not appear to be pushing CPM to do certain things,

12   though there were things that should have been done if he were in fact acting as general counsel.

13   12/19 RT at 134.

14           In Wagstaffe's view, the proper method to compute Spiller's fees under section

15   502(b)(4) is to use the lodestar method. 12/19 RT at 138.  He found $250 an hour to be

16   reasonable, but then considered the number of hours worked, the risk, the efficiency, the

17   description of the services provided (because inadequate records might lead to one not getting

18   paid), and duplication of services.  12/19 RT at 138-139.  He also looked at how much the other

19   side billed.  12/19 RT at 138.  In determining whether the contingency fee was reasonable under

20   section 502(b)(4), he also considered that there had been multiple prior lawyers and that the case

21   was undesirable.  12/19 RT at 149.  Even so, he concluded that Spiller is not entitled to any fees.

22   12/19 RT at 139.

23           Wagstaffe explained that first, Spiller's agreement did not call for him to

24   participate in trial, but he did; because he did, he had an argument for recovering his fees from

25   CPM's 28 percent.  12/19 RT at 139.  Second, because CPM acknowledged it was going to

26   pursue the buy/sell action, Spiller's role was minimal; once he convinced CPM to handle this

27   action, his role should have ceased.  12/19 RT at 140.  If, however, the October letter is

28   interpreted as expanding Spiller's role to litigating the buy/sell, then he is entitled to

14

1    approximately 200 hours for his participation. 12/19 RT at 140.  Ultimately, in Wagstaffe's

2    opinion, Spiller did not act as general counsel when it counted, which meant he was not entitled

3    to any compensation.  12/19 RT at 141.

4              ii.  The Bankruptcy Court's Findings and Conclusions

5              The bankruptcy court reviewed the evidence developed at trial, noting that Spiller

6    "was a full-fledged member of the trial team" in a trial that "resulted in a judgment in excess of

7    $4.5 million."  1/3 RT at 38; ECF No. 16.  While the judgment was on appeal, it was

8    compromised in a section 355 spin-off, whereby the money and property were distributed to a

9    newly created entity known as CWS Enterprises, Incorporated, wholly owned by debtor.  1/3 RT

10   at 38-39.  The total value of the assets spun-off to CWS was $20,5000,000 in real property and

11   $10 million in cash.  *Id.*  Debtor was facing claims for attorneys' fees in excess of the $10 million

12   in cash; the claims were resolved against him in arbitration.  *Id.*

13             The bankruptcy judge noted

14        in the midst of that representation by Cotchett, Pitre & McCarthy,
15        Mr. Spiller, Steven Spiller of the Spiller-McProud firm, who had
          been representing Mr. Siller in other matters, was asked by Mr.
16        Siller to work with him in the Siller Brothers dissolution litigation.
          Mr. Siller was interested in a number of things, including an old
17        buy/sell agreement from back in the late 1950s, 1959, and was
          interested in having a theory pursued there. And he wanted Mr.
18        Spiller to work as a general interface between him and the Cotchett
          Pitre McCarthy firm. [¶]  And I would note that Mr. Siller does not
19        have a substantial formal education, but he has been a litigant in
          many matters through the years. And I've seen him on more than
20        one occasion in this court. So I have no difficulty believing that he
          has an inherent distrust of lawyers. So he might have been
21        concerned in wanting to have somebody whom he trusted as a, to
          act as an interface, looking at the work lawyers are doing in
22        prosecuting an action that was very important to him. That's been
          my experience of Mr. Siller, both in this case and in other cases,
23        that he would be the kind of person would want that. He also would
          be the kind of person that most lawyers would describe as a
24        difficult client.

25   *Id.* at 41-42.

26             The judge explained that in a previous order, he determined that the question of

27   reasonable fees under section 502(b)(4) was a federal question and so "it was entirely possible

28   that something could be reasonable as a matter of California law but not reasonable as a matter of

federal law." *Id*. at 47.  He found Spiller's hourly rate of $250 an hour to be reasonable and then turned to a determination of "the reasonable number of hours expended."  *Id.* at 50.  He continued:

> I'm largely persuaded by Mr. Wagstaffe's analysis, but with an important difference, there's not much question that Mr. Spiller participated as a full-fledged member of the trial team.  And a good part of that, if not all of it, should come out of the Cotchett Pitre and McCarthy fee.
>
> But also in this case, there's been a large amount of water over the dam in terms of a compromise of that fee and the history of the case.  While Mr. Wagstaffe presented a powerful analysis, and one that's sufficiently powerful that I might get reversed from deviating from it, I'm persuaded that the reasonable fee under the lodestar analysis again, factoring in such matters as Mr. Siller being a difficult client, and the work that Mr. Spiller did, is to accept the $250 per hour rate, and apply it to the full 1,761 hours, which yields a reasonable fee of $440,250.
>
> There are good arguments for why I'm incorrect about — why I'm being overly generous about doing that, given paragraph 4(g) of the Cotchett, Pitre & McCarthy agreement.  But the reality is that that agreement, that analysis would work in the most just manner if Cotchett, Pitre & McCarthy had received their full share of the contingency fee.  And, in fact, they compromised for considerably less that the amount of their claim.
>
> So therefore I conclude the objection to the claim should be sustained, or is sustained, to the extent the fee exceeds $440,250.

*Id.* at 51-52.

C.  Analysis of Spiller's Appeal

Spiller argues that the trial is essentially a nullity because the bankruptcy judge determined the reasonable value of its services without considering the arbitrator's award.  Debtor and the Trustee argue that the reasonable value of Spiller's services was nothing, that Spiller misconstrues the scope of this court's May 10, 2012 order; moreover, that order was incorrectly decided and should not have controlling force.

In the order of May 10, 2012, the court generally approved Spiller's argument that the state arbitration, reduced to judgment, was entitled to preclusive effect in the bankruptcy proceedings, reversing the bankruptcy court's determination that the question of the reasonableness of the fees had not been necessarily decided nor actually litigated in the arbitration

1    proceedings.  The court determined that the standards the arbitrator used in evaluating whether

2    the contingency fees sought were unconscionable were essentially the same a bankruptcy court

3    employs in determining the reasonableness of the fees under section 502(b)(4).  Dist. Ct. CWS

4    Docket, ECF No. 42 at 21-26.

5            The Trustee argues this determination was incorrect because the similarity

6    between the factors used to evaluate unconscionability and those used to determine

7    reasonableness does not satisfy the requirement that the issues be identical for issue preclusion to

8    apply.  He says settled law requires that state and federal standards are different for purposes of

9    preclusion.

10           Neither the Trustee nor the debtor dispute that collateral estoppel or issue

11   preclusion applies in bankruptcy proceedings.  As the Supreme Court has recognized, "[i]f, in the

12   course of adjudicating a state-law question, a state court should determine factual issues using

13   standards identical to those of [Bankruptcy Act] §17 [regarding dischargeability], then collateral

14   estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues

15   in the bankruptcy court."  *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979).  The Ninth Circuit has

16   said that "the doctrines of preclusion play an important part in dischargeability proceedings by

17   preventing the relitigation of factual and legal issues already determined by other courts."  *Sasson*

18   *v. Sokoloff (In re Sasson)*, 424 F.3d 864, 873 (9th Cir. 2005); *see also Emmerson v. Regis (In re*

19   *Emmerson)*, Bankr. No. EC-10-1159-MoDh, 2011 WL 3299852, at *6 (9th Cir. BAP Mar. 25,

20   2011) (finding state court's award of punitive damages, even absent specific findings of malice or

21   oppression or fraud, may be entitled to preclusive effect in a nondischargeability action).

22           There are five basic requirements for collateral estoppel in California:  the issue

23   sought to be precluded must be identical to that previously decided, the issue must have been

24   actually litigated and necessarily decided, the decision must be final and on the merits, and the

25   party against whom preclusion is sought must be the same or in privity.  *Lucido v. Superior*

26   *Court*, 51 Cal. 3d 335, 341 (1990).  In addition, a court must consider "the public policies

27   underlying the doctrine before concluding that collateral estoppel should be applied in a particular

28   setting."  *Id*. at 342-43.  Some of the policies underlying the doctrine are "'preservation of the

1    integrity of the judicial system, promotion of judicial economy, and protection of litigants from

2    harassment by vexatious litigation.'"  *Baldwin v. Kilpatrick* (*In re Baldwin*), 249 F.3d 912, 919-

3    20 (9th Cir. 2001) (quoting *Lucido*, 51 Cal. 3d at 343).

4                       For collateral estoppel purposes in California,

5                an issue was actually litigated in a prior proceeding if it was
                 properly raised, submitted for determination, and determined in that
6                proceeding.  In considering whether these criteria have been met,
                 courts look carefully at the entire record from the prior proceeding.
7                . . . The 'identical issue' requirement addresses whether 'identical
                 factual allegations' are at stake in the two proceedings, not whether
8                the ultimate issues or dispositions are the same.

9    *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 514 (2009) (internal citation & quotation omitted);

10   *see also Genesis VJ, Inc. v. Nguyen (In re Nguyen),* BAP No. CC-11-1379-LaPaMK, 2012 WL

11   603680, at *6 (BAP 9th Cir. Feb. 17, 2012); *Flores v. Transamerica HomeFirst, Inc*., 93 Cal.

12   App. 4th 846, 852 (2001) ("the legal matter raised in the second proceeding must involve the

13   same set of events or documents and the same bundle of legal principles that contributed to the

14   rendering of the first judgment").  "It is not an easy rule to apply, for the term 'issue' in this

15   connection is difficult to define . . . ."  *Clark v. Lesher*, 46 Cal.2d 874, 880 (1956); *Burdette v.*

16   *Carrier Corp*., 158 Cal. App. 4th 1668, 1689 (2008) ("Determining the issue foreclosed by the

17   prior judgment is one of the most difficult problems in applying the rule of issue preclusion.").

18   "For purposes of issue preclusion . . . an 'issue' includes any legal theory or factual matter which

19   could have been asserted in support of or opposition to the issue that was litigated."  *Border Bus.*

20   *Park, Inc. v. City of San Diego*, 142 Cal. App. 4th 1538, 1565-66 (2006).

21                       California courts consider a number of factors when evaluating the identity of

22   issues for issue preclusion purposes:

23               "Is there a substantial overlap between the evidence or argument to
                 be advanced in the second proceeding and that advanced in the
24               first?  Does the new evidence and argument involve application of
                 the same rule of law as that involved in the prior proceeding?
25               Could pretrial preparation and discovery relating to the matter
                 presented in the first action reasonably be expected to have
26               embraced the matter sought to be presented in the second?  How
                 closely related are the claims involved in the two proceedings?"
27

28   *Happy Nails & Spa of Fashion Valley, L.P. v. Su*, 217 Cal. App. 4th 1459, 1469 (2013) (quoting

                                                    18

1    *Burdette*, 158 Cal. App. 4th at 1689).

2               In *Hernandez*, supra, the California Supreme Court considered whether an issue

3    decided under federal law would have preclusive effect in a state-law claim.  In that case, the

4    family of a man killed by police officers brought a civil rights action in federal court, alleging the

5    officers had not exercised reasonable care in using deadly force.  46 Cal. 4th at 512.  After a

6    federal jury rejected their claim, the family brought a state negligence action, alleging the officers

7    had not used reasonable care in shooting the decedent as he fled from the police.  *Id.* at 513.  The

8    California Supreme Court upheld the lower court's determination that the state negligence action

9    was barred by collateral estoppel.  *Id.* at 517-18.  It compared the formulation for reasonableness

10   under federal and state law, both of which required an examination of the totality of the

11   circumstances, and concluded the federal jury had decided the identical issue presented by the

12   state-law negligence claim.  *Id.* at 516.

13              In this case, the claims involved in the arbitration and the claims allowance

14   process in bankruptcy are certainly closely related, with a substantial overlap in the evidence and

15   the parties' arguments.  The Trustee argues, however, that the issues, which are distinct from the

16   claims, cannot be identical because a different rule of law applied in the arbitration.  California

17   courts recognize that when the previous decision stems from a different factual and legal

18   foundation than the current issue, collateral estoppel does not apply.  *United States Golf Assn. v.*

19   *Arroyo Software Corp.*, 69 Cal. App. 4th 607, 617 (1999).  The Trustee relies on *Wimsatt v.*

20   *Beverly Hills Weight Loss Clinics Intl., Inc.*, 32 Cal. App. 4th 1511 (1995).  In *Wimsatt*, the state

21   appellate court considered whether a federal district court order concerning the validity of a

22   forum selection clause was entitled to preclusive effect in a state action challenging the same

23   clause.  The state court examined the basis of the federal decision, concluding that the federal

24   judge had decided only whether the plaintiffs had the right to sue in federal court in California,

25   not whether the forum selection clause was valid and enforceable in California.  *Id.* at 1517.  It

26   examined the underpinning of the federal determination, observing federal courts apply federal

27   procedural rules in evaluating forum selection clauses and concluding that the prior federal

28   decision had resolved the case as a matter of federal procedural law only.  *Id.* at 1519.  The state

1    court of appeal concluded that the federal court had not decided that plaintiffs had no right to sue

2    in state court: "[b]y starting with federal procedural law, he could by definition never reach the

3    question of the 'validity' of the forum selection clause under the substantive law of California."

4    *Id.* at 1520.  *Wimsatt* thus provides little guidance here, for both the arbitrator and the bankruptcy

5    judge applied substantive law in reaching their decisions.

6              The Trustee also argues that in the state arbitration proceedings, Spiller's only

7    burden was to prove the enforceability of his fee agreement and so the arbitrator's decision was

8    limited to that question only, whereas under section 502(b)(4), Spiller's burden is to show the

9    reasonable value of his services to the debtor.  *See* 11 U.S.C. § 502(b)(4).  The Trustee argues that

10   only in the bankruptcy context does Spiller bear the burden of proving the value of his services.

11             Whether Spiller's only burden during the arbitration was to show he had an

12   enforceable contract, as the Trustee argues, debtor specifically attacked Spiller's 8% contingency

13   fee as unconscionable.  *See Marin Storage & Trucking, Inc. v. Benco*, 89 Cal. App. 4th 1042,

14   1049 (2001) ("The doctrine of unconscionability is a defense to the enforcement of a contract or a

15   term thereof."); Cal. Civ. Code § 1670.5.  Moreover, "[n]o fee agreement 'is valid and

16   enforceable without regard to considerations of good conscience, fair dealing . . . and the eventual

17   effect on the cost to the client.'"  *Bird, Marella, Boxer & Wolpert v. Superior Court*, 106 Cal.

18   App. 4th 419, 431 (2003) (quoting *Altschul v. Sayble*, 83 Cal. App. 3d 153, 162 (1978)); *see also*

19   Cal. Rules Prof. Conduct  4-200(A).[5]  "As a matter of professional responsibility, California

20   _____

21   [5]  Case law says that unconscionability is determined "with reference to the time when the
     contract was made and cannot be resolved by hindsight."  *Brobeck, Phleger & Harrison v. Telex*

22   *Corp.*, 602 F.2d 866, 875 (9th Cir. 1979) (interpreting California law); Cal. Rules Prof.
     Conduct  4-200(B) ("Unconscionability of a fee shall be determined on the basis of all the facts

23   and circumstances existing at the time the agreement is entered into except where the parties
     contemplate that the fee will be affected by later events.").  Despite this statement, the factors

24   listed in Rule 4-200(B), such as the amount of the fee in proportion to the value of the services,
     and the amount involved and the results obtained, call for consideration of counsel's work on a

25   particular case.  Indeed, the arbitrator rejected the debtor's claim that Spiller "provided no value
     to Respondent Siller in the case.  The evidence presented demonstrates just the opposite.  The

26   testimony was clear that Spiller after his retention was involved with every aspect of the litigation
     along with Pitre's office.  Respondents' bald assertion that Spiller did no work to benefit

27   Respondents has no evidentiary basis.  Based on the evidence and legal authority, Spiller is
     entitled to his 8% contingency."  Arbitration Order at 22.

28

1    lawyers are entitled to charge clients no more than a reasonable fee for legal services." *Cazares*

2    *v. Saenz*, 208 Cal. App. 3d 279, 287 (1989).

3            Although the arbitrator did not specifically discuss every factor he considered,

4    under California law, a challenge to a fee as unconscionable requires an examination of (1) the

5    amount of the fee in proportion to the value of the services performed; (2) the relative

6    sophistication of the lawyer and the client; (3) the novelty and difficulty of the questions in the

7    litigation and the level of skill necessary to present the client's position; (4) the likelihood that the

8    lawyer's acceptance of the contract will preclude other employment; (5) the amount involved and

9    the results obtained; (6) any time limitations imposed; (7) the nature and length of the

10   professional relationship; (8) the lawyer's experience and reputation; (9) whether the fee is fixed

11   or contingent; (10) the time and labor involved; and (11) the client's informed consent.  *Cotchett,*

12   *Pitre & McCarthy v. Universal Paragon Corp.*, 187 Cal. App. 4th 1405, 1418-19 (2010); *see*

13   *generally Happy Nails*, 217 Cal. App. 4th at 1471 (concluding administrative law judge had

14   applied multi-factor test even though he did "not explicitly state the issues to be decided");

15   *Murphy v. Murphy*, 164 Cal. App. 4th 376, 400 (2008) (a court's failure to make findings "does

16   not establish that the issues in the two proceedings were not identical").

17           The Trustee argues the arbitrator did not decide whether the contingency fee was

18   reasonable.  He cites to a passage in which the arbitrator rejected debtor's argument that he

19   should apply the factors in *Fergus v. Songer*, 150 Cal. App. 4th 552 (2007), and concluded the

20   nine factors regarding reasonable attorney's fees outlined in the charge to the jury in *Fergus* were

21   inapplicable.  Civ. No. 10-779 & 10-780, Excerpt of Record (EOR) at 243 (Award at 22).

22   Despite the arbitrator's rejection of the *Fergus* factors, he also specifically rejected debtor's

23   argument that the contingency fee contract was unconscionable:

24              Respondents attack Spiller's contingency fee of 8% as
                "unconscionable".  Respondents fail to cite any case that directly or
25              indirectly holds such a position. The law is quite the contrary.  (See
                *Ketchum v. Moses* (2001) 24 Cal. 4th 1122, 1132 (holding a
26              contingent fee contract may properly provide for a greater
                compensation than would otherwise be reasonable); *Rader v.*
27

28   /////

*Thrasher* (1962) 57 Cal. 2d 244, 253; *Estate of Guerin* (1961) 194 Cal.App.2d 566, 575 (holding a 50% contingency fee conscionable).

Civ. Nos. 10-779 & 10-780 EOR at 242 (Award at 21).  As noted in the court's May 10, 2012 order, such a determination required a consideration of the factors mirroring those informing the federal bankruptcy reasonableness determination.  *See* Civ. Nos. 10-779, 10-780, ECF Nos. 33, 42 at 21-22.

    In determining whether an insider's fees are reasonable under section 502(b)(4), a bankruptcy court should consider "the same reasonableness standard set forth in section 330." *Margulies Law Firm, APLC v. Placide (In re Placide)*, 459 B.R. 64, 73 (BAP 9th Cir. 2011). Those factors include "(1) The amount of work done; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the results accomplished; (5) whether the fee is fixed or contingent; (6) the amount involved in connection with the services rendered; (7) the length of time consumed; (8) the experience, reputation, and ability of the attorneys; (9) the size of the estate; and (10) the opposition met." *In re Nelson*, 206 B.R. 869, 882 (Bankr. N.D. Ohio 1997)[6]; *see CRG Partners Group, L.L.C. v. Neary (In re Pilgrim's Pride)*, 690 F.3d 650, 654 (5th Cir. 2012) (recognizing that list of factors in § 330 is not exclusive because the statute directs the court to consider "all relevant factors;" then listing twelve relevant factors); *Heritage Organization, LLC v. Canada* (*In re Heritage Organization*), Bankr. No. 04-35574-BJH-11, 2006 WL 6508182, at *8 (N.D. Tex. Jan. 6, 2006) ("In analyzing the reasonableness of a claim for services under § 502(b)(4), a court should consider the totality

---

[6] The Trustee claims incorrectly that *Nelson* applied Ohio law on attorney's fees. The court in *Nelson* derived ten factors from Sixth Circuit cases, saying the factors "may be considered as guidelines in determining the amount of attorney's fees to be awarded under 11 U.S.C. § 330", *In re Nelson*, 206 B.R. at 882; it found the factors also applicable to the similar determination under section 502(b)(4). Earlier in its order, the *Nelson* court had referenced the eight factors under Ohio law.  *Id.* at 879.  To the extent this court's prior order mentioned the eight factors, it  referred to the wrong portion of the *Nelson* opinion.  Moreover, although the parties do not discuss the concept of value, it appears to be folded into the reasonableness inquiry: "Value" within the meaning of section 502(b)(4) "is synonymous with the concept of 'market value' or 'price' such that an attorney is entitled to fees up to the reasonable market value of his services."  *Food Mgmt. Grp, LLC v. Pu* (*In re Food Mgmt Grp*.), Bankr. Nos. 04-22880 (ASH), 2008 WL 2788738, at *5 (S.D.N.Y. July 16, 2008).

1    of the circumstances involved at the time that the services were rendered.").  Although the factors

2    are phrased somewhat differently, the inquiries are the same, whether under California's

3    evaluation of the unconscionability of a fee and its general reasonableness, or the general

4    reasonableness of fees under bankruptcy law.  *See In Re SNTL Corp.*, 571 F.3d 826, 845 n.20 (9th

5    Cir. 2009) (recognizing that California's attorney's fee doctrine "impose[s] requirements in the

6    nature of reasonableness" and comparing the requirements to the Bankruptcy Code's

7    reasonableness limitations).

8            The Trustee argues that even if the arbitrator determined that Spiller's fees were

9    reasonable under state law, numerous cases recognize that reasonableness under section 504(b)(4)

10   is a federal question.  *See, e.g., In re Segovia*, 387 B.R. 773, 779 (Bankr. N.D. Cal. 2008)

11   (question whether fees are reasonable for the purposes of § 504(b)(2) is a question of federal law).

12   In none of the Trustee's cases, however, had the fees been reduced to judgment and so these cases

13   do not necessarily answer the question presented in this case.

14           The Trustee also relies on *Bitters v. Networks Electronics* (*In re Networks*

15   *Electronic Corp.*), 195 B.R. 92, 96 (BAP 9th Cir. 1996) and *Kohn v. Leavitt-Berner Tanning*

16   *Corp.*, 157 B.R. 523 (Bankr. N.D.N.Y. 1993).  In *In re Networks Electronics*, the bankruptcy

17   appellate panel considered the relationship between a state court judgment and the cap on claims

18   stemming from the breach of an employment contract contained in 11 U.S.C. § 502(b)(7):

19           Once the bankruptcy court determined that the state court judgment
             resulted from the breach of an employment contract, that claim was
20           subject to the application of an exception to allowance provided in
             the Bankruptcy Code. . . . Disallowance of the claim under
21           §502(b)(7) is a matter of federal law, for it involves the extent to
             which Congress has exercised its constitutional power to establish
22           "uniform Laws on the subject of Bankruptcies throughout the
             United States." U.S. Const., art. I, § 8, cl. 4. To the extent that
23           Bitters argues that state law should prevail over the Bankruptcy
             Code, such is not the case under the Supremacy Clause, U.S. Const.
24           art. VI, § 2. Federal law preempts a state law or order which
             "stands as an obstacle to the accomplishment and execution of the
25           full purpose and objectives of Congress."

26   195 B.R. at 97.

27   /////

28   /////

1    In *Kohn*, the bankruptcy court considered the cap on claims stemming from the

2    breach of a lease agreement contained in 11 U.S.C. § 502(b)(6):

3    Section 502(b) requires the bankruptcy court to undertake a two-
     part analysis.  First the court must "determine the amount of [a
4    creditor's] claim as of the date of the filing of the petition . . ."  In
     such as the one at bar, this means accepting as non-reviewable the
5    amount of the claim as determined by the state court.  This figure
     then forms the basis for the second part of the analysis, wherein the
6    court  determines  how  much  of  the  claim  should  be
     allowed.  Applying the principles of equity inherent in the code, the
7    court looks behind the judgment to ascertain the relationship
     between the parties.  When the parties stand as lessor and lessee, as
8    in the case at bar, § 502(b)(6) applies.  This subsection applies a
     formula to which the previously determined judgment figure is
9    applied, resulting in a second figure – the allowable portion of the
     original judgment.  This second figure represents Congress' view of
10   what is equitable between a lessor and lessee in bankruptcy.

11   157 B.R. at 527 (footnote omitted); see also *Saddleback Valley Cmty. Church v. El Toro*

12   *Materials Co., Inc. (In re El Toro Materials Co., Inc.)*, 504 F.3d 978, 980 (9th Cir 2007) (stating

13   the cap in § 502(b)(6) was "'designed to compensate the landlord his loss while not permitting a

14   claim so large (based on a long-term lease) as to prevent other general unsecured creditors from

15   recovering a dividend from the estate'") (quoting S. Rep. No. 95-989 at 63).

16   Even assuming without deciding that the analysis required by 11 U.S.C. sections

17   502(b)(6) and (b)(7) applies to a section 502(b)(4) question, *see Network Electronics*, 195 B.R. at

18   100 (saying that the 502(b)(7) "cannot readily be analogized to 502(b)(6)"), the *Network*

19   *Electronics* and *Kohn* cases do not require a contrary result in this case.  The cap in section

20   502(b)(4) is that of reasonableness.  In *Landsing Diversified Properties-II v. First Nat'l Bank and*

21   *Trust Co.* (*In re Western Real Estate Fund, Inc.*), the Tenth Circuit recognized that section

22   502(b)(4) "places an outside 'reasonable value' limitation on [the creditor's claim] for breach of

23   his fee contract . . . ."  922 F. 2d 592, 597 (10th Cir. 1991).  It is the cap of reasonable value that

24   serves to protect other creditors from excessive attorneys' fees, in the same way the caps in

25   sections 502(b)(6) and (b)(7) protect other creditors from a too generous or even cozy fee

26   arrangement between landlord and tenants and employers and employee.  *See In re Food Mgmt.*

27   *Grp.* 2008 WL 2788738 at *5 (limiting fees to reasonable value "prevent[s] the debtor from

28   defrauding its creditors by agreeing to pay its attorney excessive fees").  The Trustee has not cited

24

1    anything suggesting that a bankruptcy judge is empowered to do anything but determine

2    reasonable value in applying the federal standard.  *See Raleigh v. Illinois Dep't of Revenue*, 530

3    U.S. 15, 24-25 (2000) (recognizing that "the validity of a claim is generally a function of the

4    underlying substantive law.  Bankruptcy courts are not authorized in the name of equity to make

5    wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are

6    limited to what the Bankruptcy Code itself provides.").

7           To the extent the Trustee relies on the bankruptcy court's policies and practices as

8    a reason for avoiding preclusion in this case, such reliance is unavailing.  As the Ninth Circuit has

9    noted, "[w]here, as here, the state court was fully capable of adjudicating the issue subsequently

10   presented to the bankruptcy court, we conclude that the public's confidence in the state judicial

11   system would be undermined should the bankruptcy court relitigate the question . . . ."  *In re*

12   *Baldwin*, 249 F.3d at 920.  Here, the arbitrator determined that Spiller's fees were not

13   unconscionable applying a test equivalent to the federal reasonableness test.  The arbitrator's

14   resolution of the fee dispute, reduced to judgment in state court, controls the resolution of

15   Spiller's claim against the debtor's estate.

16          The court declines to find its order of May 10, 2012, was incorrectly decided.

17          Spiller then argues there is no need for further proceedings in the bankruptcy court

18   because the approved plan of reorganization contemplates that the results of any appeal will be

19   factored into the reorganization plan.  Civ. No. 12-142 docket, ECF No. 11 at 10.

20          In the Third Amended Joint Plan of Reorganization, filed in the bankruptcy

21   proceedings on April 16, 2012, that court recognized that Spiller's claim was disputed and the

22   subject of appeal and allowed Spiller to "continue such appeals and to liquidate the Class 2.6 b

23   Claim pursuant to those appeals and any potential remand."  *CWS Docket*, ECF No. 1059 at 4

24   ¶ 2.6 b.  It further provides that the Reorganized CWS Enterprises will pay Spiller $440,250 plus

25   interest, but makes provision for the payment or of other sums or refund of sums paid, depending

26   on the outcome of the appeals.  *Id*.

27          This court's order of May 10, 2012 determined that the bankruptcy court had erred

28   in denying Spiller's motion for summary judgment which sought a ruling that the entire amount

                                            25

1    of the claim as established by the state court judgment should be allowed under § 502(b)(4).

2    Accordingly, as that order established the allowable amount of the claim, there is no need for

3    further proceedings in the bankruptcy court.  Under the Third Amended Joint Plan of

4    Reorganization, Spiller is entitled to his share of the amount of the joint claim he originally filed

5    with CPM.

6         D.  Trustee's Cross-Appeal

7              The Trustee argues that the bankruptcy judge erred in rejecting Wagstaffe's

8    opinion that Spiller was entitled to no compensation and instead determining Spiller should

9    receive his hourly wage for the 1760 hours he spent on debtor's affairs.  The Trustee argues that

10   Wagstaffe's testimony shows that only $72,000 of the all the time Spiller reported as spending on

11   debtor's litigation were incurred within the scope of Spiller's agreement to serve as debtor's

12   general counsel and that even those fees were not reasonable, in that Spiller failed to fulfill his

13   general counsel responsibilities when he "sid[ed] with Cotchett" in an effort to ensure that the

14   fees were paid before the Freidberg and Thomas-Hauser claims were resolved.  Spiller has argued

15   only that the bankruptcy court's judgment violates this court's order of May 10; as he has not

16   otherwise challenged the court's determination of his entitlement to fees, any such argument is

17   waived.  *Wake v. Sedona Inst*. (*In re Sedona Inst*.), 220 B.R. 74, 76 (9th Cir.1998) (noting an

18   issue not briefed is deemed waived).

19              The Trustee argues, in essence, that Spiller's services cannot be deemed

20   reasonable as a matter of law because they were outside the scope of the contract.  He cites to

21   *In re Molten Metal Technology, Inc.*, 289 B.R. 505, 515 n.24 (Bankr. D. Mass 2003), which

22   rejected a firm's application for fees under § 330 on the ground that some of the services were

23   rendered after the debtor in possession, whom it represented, had been replaced by a trustee and

24   thus were outside the scope of employment, and also that some were taken in opposition to the

25   interests of the estate.  Similarly, in *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug*

26   *Co. (In re Mednet, MPC Corp.)*, 251 B.R. 103, 108 (9th Cir. BAP 2000), the court said a

27   bankruptcy judge should consider, among other factors, whether services were authorized in

28   determining the reasonable fee under § 330.

1    In this case, the bankruptcy judge appeared to accept Wagstaffe's characterization

2    of Spiller's contract with the debtor, without providing an explicit interpretation.  This court does

3    not interpret the contract as Wagstaffe did, and it finds the bankruptcy court did not err in

4    rejecting Wagstaffe's opinion that Spiller should receive no compensation.

5    In California, the goal of contract interpretation is to give effect to the parties'

6    intention as it existed when the contract was executed.  *Foster-Gardner, Inc. v. Nat'l Union Fir*

7    *Ins. Co*., 18 Cal. 4th 857, 868 (1998); Cal. Civ. Code § 1636.  In so doing, the "whole of a

8    contract is to be taken together, so as to give effect to every part, if reasonably practical, each

9    clause helping to interpret the other."  Cal. Civ. Code § 1641.  A contract for attorney's fees is

10   strictly construed against the attorney.  *Alderman v. Hamilton*, 205 Cal. App. 3d 1033, 1037

11   (1988).

12   In his contract with the debtor, Spiller agreed he would "<u>assist</u>, advise and discuss

13   these legal matters personally with you and as an interface with the attorneys at the Cotchett law

14   firm."  EOR at 14 (emphasis added).  He also specified that Siller had consulted him in

15   connection with the Siller Brothers dissolution action.  EOR at 14.  The somewhat infelicitous

16   language of the contract thus contemplates that Spiller would "assist" with the debtor's legal

17   matters as well as acting as an interface with CPM.  In a separate sentence ("[i]n addition, I would

18   act as your general counsel to communicate to the Cotchett law firm . . . ."), Spiller outlined

19   additional duties.  *Id.*  To avoid rendering the second sentence surplusage, the first sentence,

20   giving Spiller the dual role of assistant and advisor, should be read as establishing duties separate

21   from those as general counsel.  *See Berg v. MTC Elec. Tech*., 61 Cal. App. 4th 349, 361 (1998)

22   ("[T]he normal application of the principle of contract interpretation that calls for avoiding

23   constructions which create surplusage of one clause in a contract so as to render another clause in

24   the same contract surplus.").  The bankruptcy judge could rely on provisions allowing Spiller to

25   assist as a basis of finding that his actions were within the scope of his employment and that his

26   work on the valuation of Spiller Brothers' timber lands, as well as his other work, met the

27   § 502(b)(4) reasonableness standard.

28   /////

27

1    The Trustee also argues that Spiller's abandonment of his client at the time CPM

2 sought its fees reduces the value of his services to nothing.  The Ninth Circuit has said that a court

3 may consider a lawyer's misconduct in setting fees, recognizing that misconduct might reduce a

4 fee to "'zero' at least 'when the violation is one that pervades the whole relationship.'"

5 *Rodriguez v. Disner*, 688 F.3d 645, 654 (9th Cir. 2012) (quoting *United States ex. rel. Virani v.*

6 *Jerry M. Lewis Truck Parts & Equip. Inc.*, 89 F.3d 574, 579 (9th Cir. 1996)).

7    In this case, the contract does not require Spiller to act as general counsel for all

8 matters, but as general counsel to communicate debtor's ideas concerning the litigation to CPM.

9 EOR at 14.  The bankruptcy judge could rely on this provision of the contract as well to find that

10 Spiller's failure to intercede regarding fees at the end of the Siller Brothers litigation was not a

11 violation, or if it was, that it did not pervade the whole relationship.

12    Moreover, to the extent Wagstaffe's opinion is based on his belief that the

13 contingency had not occurred until all the matters were resolved, the bankruptcy judge could have

14 rejected this conclusion.  Whatever CPM's contract provided concerning the resolution of the

15 other outstanding matters with Siller's prior lawyers, Spiller's contract limited his role to

16 providing "assistance and advice to you concerning your current lawsuit against Siller Brothers,

17 Inc., in the Sutter County Superior Court for dissolution of the corporation."  EOR at 14.  It also

18 specified that Spiller agreed to represent the debtor "for a contingency fee of eight percent (8%)

19 of the 'Net Amounts' recovered by settlement, compromise or trial under the same definition you

20 have agreed with the Cotchett firm . . . . [Y]ou and I agree to incorporate the terms and conditions

21 of the Cotchett fee agreement into this agreement except that the legal services that I have agreed

22 to provide are as described in this letter agreement."  EOR at 15.  As noted, Spiller described the

23 legal services he undertook as relating to the Siller Brothers dissolution, not the various claims

24 advanced by and against debtor's former lawyers.  The bankruptcy court could thus have

25 disagreed with Wagstaffe and concluded that the contingency requiring debtor to pay Spiller had

26 occurred at that conclusion of the Siller Brothers litigation.[7]

27

28    [7]  The arbitrator reached a similar conclusion:  Respondents also contend that Spiller's fee is unconscionable because the Freidberg professional negligence action was lost.  The problem with

28

1         The bankruptcy judge could have found, and implicitly did find, that Spiller's and

2   CPM's request for their fee at the conclusion of the dissolution action was not misconduct.  That

3   decision was not in error.  The Trustee's motion is denied.

4         IT IS THEREFORE ORDERED that:

5         1.    The motions for rehearing and vacatur filed by Siller and the Trustee in

6   Civ. No. 10-780, ECF Nos. 44 and 48, are denied;

7         2.    In light of the order of May 10, 2012 in Civ. Nos. 10-779 and 10-780, the

8   bankruptcy court's order of January 3, 2012 is reversed; and

9         3.    Under the Third Amended Joint Plan of Reorganization in No. 09-26849-

10  C-11, Spiller is entitled to his portion of the claim filed June 8, 2009.

11  DATED:  September 17, 2014.

12

13  _____

14  UNITED STATES DISTRICT JUDGE

---

27  this argument is that Spiller is not seeking fees from the Freidberg professional negligence action.
    Rather, Spiller seeks to recover from the recovery in the dissolution matter.  Civ. Nos. 10-779 &
28  10-780, EOR at 243 (Award at 22).